**W.T., a minor, by his mother, Catherine TATUM as his next friend; and Catherine Tatum, Plaintiffs,**

**v.**

**ANDALUSIA CITY SCHOOLS; and Robert Moseley, in his individual and official capacity as Superintendent, Defendants.**

Civil Action No. 95–T–767–N.

United States District Court,
M.D. Alabama,
Northern Division.

Sept. 26, 1997.

**1438**

Matthew C. Lamere, Parkman, Brantley, Lamere & Atwell, Dothan, AL, Bobbie S. Crook, Dothan, AL, for Plaintiff.

Donald B. Sweeney, Jr., Rives & Peterson, Birmingham, AL, for Defendants.

### MEMORANDUM OPINION

MYRON H. THOMPSON, Chief Judge.

Plaintiffs, W.T. (a minor) and Catherine Tatum (his mother), have brought this lawsuit under the Individuals with Disabilities Education Act, also known as the IDEA, 20 U.S.C.A. §§ 1400–1491, against defendants, the Andalusia City Schools and the Superintendent of the School System, charging that the school system failed to provide W.T. with special education services, excluded him from the educational environment without regard to his disability, retaliated against him due to his mother's attempts to obtain special education services for him, and refused him access to all of his school records.[1] Plaintiffs sought declaratory and injunctive relief. All parties agreed that the substantive issues in the case were mooted when the Andalusia City School System designated W.T. as "emotionally-conflicted" and "other health

impaired," entitling him to special education services under the IDEA.

This lawsuit is now before the court on plaintiffs' motion for attorneys' fees and expenses pursuant to 20 U.S.C.A. § 1415(e)(4). For the reasons that follow, the motion will be granted and the parties will be allowed to submit additional materials so that the court can determine the amount of money to which plaintiffs are entitled.

## I. BACKGROUND

### A.

Under the IDEA, the federal government provides financial assistance to States, including the State of Alabama, that provide a "free appropriate public education" to its disabled students. 20 U.S.C.A. § 1401(a)(18). The Act states that its primary purpose is "to assure that all children with disabilities have available to them ... a free appropriate public education which emphasizes special education and related services designed to meet their unique needs, ... [and] to assure that the rights of children with disabilities and their parents or guardians are protected." 20 U.S.C.A. § 1400(c).[2] The Act provides for parent and guardian participation in all matters related to the child's education, and specifies procedural safeguards to ensure that parents and guardians have processes of review to address any decisions or placements which they deem inappropriate or unsatisfactory. § 1415. The IDEA assures parents and guardians of the right to examine all records pertaining to evaluation and educational placement of the child, to obtain an independent evaluation of the child, and to receive prior written notice whenever the responsible educational agency proposes or refuses to change the child's placement. § 1415(b).

But the driving force behind the IDEA is the "individualized education program," com-

---

1. The original suit was also brought under the § 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C.A. § 794, and 42 U.S.C.A. § 1983, but plaintiffs seek attorneys' fees only under the IDEA.

2. The IDEA was comprehensively overhauled in 1997, Pub.L. 105–17, 111 Stat. 37. However, the amendments, which are known as the "Individuals with Disabilities Education Act Amendments for 1997," are either prospective or are not relevant to the issues presented to this court today. Therefore, the IDEA, as addressed in this opinion, is pre–1997 amendments.

monly known as the IEP. § 1401(a)(20). The IEP must provide in detail for a disabled child's educational goals and objectives, including measurement techniques, and the related support services to be provided, along with the duration of each service. *Id.* The IEP is developed at a meeting, which must include at least a parent or guardian, the child's teacher (who may be a current or a future teacher), and a representative of the local school board. *Id.* The IDEA requires that the local school board "establish or revise, whichever is appropriate, an [IEP] for each child with a disability . . . at the beginning of each school year and . . . then review and, if appropriate, revise, its provisions periodically, but not less than annually." § 1414(a)(5).

The IDEA further provides that if the parent or guardian is dissatisfied with the results before the local school board, she must be provided an opportunity to present a "complaint" and receive an "impartial due process hearing" with respect to the complaint. § 1415(b). If the parent or guardian is still dissatisfied, she may invoke additional administrative review by a state educational agency. § 1415(c). Dissatisfaction with the agency's decision may then be subject to judicial review in a federal district court. § 1415(e)(2).

### B.

At the time this lawsuit was filed in June 1995, W.T. was a 14–year–old student enrolled in the Andalusia City School System. He had been diagnosed with, and treated for, Attention Deficit Hyperactive Disorder since 1987, and he had also suffered from various emotional problems, including depression.[3]

Tatum is W.T.'s adoptive mother and his natural grandmother. She has been actively involved in his education for many years and has contacted the school system on numerous occasions to urge that he receive evaluations and educational services under the IDEA and other programs.[4]

At Tatum's request, W.T. was reevaluated by the school system in 1992 and 1993 for eligibility for special services under the IDEA on the basis of his emotional problems and his Attention Deficit Hyperactive Disorder. He was determined to be ineligible for special services, despite his disability, on both occasions.[5]

In June 1994, W.T. was placed in a program at an adolescent adjustment center, apparently after physically attacking Tatum at home, and he remained there until February 1995. During this period, Tatum contacted the Andalusia City School System, its superintendent, the Governor of Alabama, and officials at the adjustment center, to request that W.T. be declared eligible for special education services under the IDEA. Shortly thereafter, she received a response from the State Superintendent of Education, telling her that, according to the Andalusia City School System, W.T. was ineligible for special education services.[6] The letter referred her to the Alabama State Department of Human Resources for any further questions, because that Department had custody of W.T. at that time.[7]

W.T. re-enrolled in the Andalusia City School System on February 17, 1995. Several weeks later, on March 17, 1995, he was suspended from school due to disruptive behavior.[8] Immediately after the suspension, Tatum hired attorneys and requested a due-

---

3. Plaintiffs' motion for attorneys' fees and costs, at Exh. 3 (letters from Drs. Eldridge and White).

4. *Id.* at Exh. 8.

5. W.T. did receive some accommodation for his Attention Deficit Hyperactive Disorder at school under § 504 of the Federal Rehabilitation Act during this period. *See supra* note 1. However, this accommodation did not include special education services.

6. *Id.* at Exh. 2 (February 16, 1995 letter from Wayne Teague, State Superintendent of Education).

7. From the evidence submitted to the court, it is impossible to determine who had custody of W.T. at every stage of this litigation. W.T. was in numerous foster homes during the period between February 1995 and October 1995. At all times, however, Tatum retained her parental rights.

8. Plaintiffs' motion for attorneys' fees and costs, at Exh. 1 (March 17, 1995, notice of school suspension).

process hearing to appeal the school system's determination that W.T. was not disabled under the IDEA.[9] Tatum's attorneys also referred W.T. to Richard Dismukes, a psychologist, for evaluations and testing.[10] In his report of April 6, 1995, Dismukes recommended that W.T. be given counseling and special education services in an "emotional conflict" classroom.[11]

In April 1995, by agreement of all interested parties and in response to problems W.T. was having at home, the Juvenile Court of Covington County gave temporary, 90–day, custody of W.T. to Angela Worley, his half-sister.[12] The Juvenile Court's custody order specifically permitted Tatum to "attend any such meeting, evaluations, and hearings [concerning W.T.'s educational needs] as she wishes."[13] It further stated that "Tatum retains the right to authorize release of records of [W.T.] to any individual."[14] The issue of W.T.'s permanent custody was to be reconsidered after the 90–day period.

Meanwhile, the administrative due-process hearing requested by Tatum was set for May 17–19, 1995. Relying on the fact that Tatum no longer had physical custody of W.T., the Andalusia City School System filed a motion to dismiss Tatum's due-process request.[15] In support of its motion, the school system submitted Worley's affidavit stating that she believed that W.T. "is receiving the best education possible from the Andalusia City School System for the end of the 1995 school term." Worley stated that, "In my opinion, the Andalusia City School System has gone out of its way to meet [W.T.'s] needs, as well as making every effort to assist me with [W.T.'s] needs when necessary."[16]

In a decision of May 8, 1995, the due-process hearing officer dismissed Tatum's request for a hearing without prejudice, finding that "the mother does not have legal custody of the child and ... the individual who does have legal custody, Angie Worley, does not wish to proceed with the due process hearing."[17] This is the only reason the hearing officer articulated for dismissing Tatum's due-process request.

On June 6, 1995, W.T. and Tatum filed this lawsuit to appeal the dismissal. Tatum still did not have physical custody of W.T. at that point.[18] However, Worley gave up custody of W.T. on June 13,[19] and custody was restored to Tatum on July 18.[20] Over that summer, the Department of Human Resources sent W.T. for an evaluation by Vaughan Psychiatric Services. He was further evaluated by Dismukes.[21] At least one meeting was held between school officials, Human Resources Department officials, and Dismukes in July to discuss W.T.'s situation.[22] On August 9, 1995, the Multi–Eligibility Determination Committee of the Andalusia City School System reassessed W.T. and determined that he was "emotionally conflicted" and "other health impaired," making him eligible for special education services under

9. *Id.* at Exh. 9 (Plaintiffs' March 20, 1995, letter requesting due process hearing).

10. *Id.* at Exh. 15 (April 6, 1995, report of Richard Dismukes).

11. *Id.*

12. Defendants' reply in opposition to fees and costs, at Exh. B (Aff. of Angie Whorley).

13. Plaintiffs' response to defendants' reply in opposition to fees and costs, at Exh. F (April 14, 1995, order of Covington County Juvenile Court).

14. *Id.*

15. *Id.*

16. *Id.*

17. Defendants' reply in opposition to fees and costs, at Exh. C (May 8, 1995, decision of due-process hearing officer).

18. Plaintiffs' response to motion for summary judgment, at Exh. A (Aff. of Catherine Tatum).

19. Plaintiffs' response to defendants' reply in opposition to fees and costs, at Exh. G (Angie Worley's motion to withdraw and release).

20. Plaintiffs' response to motion for summary judgment, at Exh. A (Aff. of Catherine Tatum).

21. Plaintiffs' response to defendants' reply in opposition to fees and costs, at Exh. C (Aff. of Richard Dismukes).

22. *Id.*

the IDEA.[23] The Multi–Eligibility Determination Committee's report cited Dismukes's April 6, 1995, evaluation and a 1992 evaluation by another expert as the bases of its determination regarding his emotional impairment.[24] The Committee convened a meeting to develop an IEP for W.T. on August 15, 1995, with Tatum and her attorneys in attendance. The meeting was deferred at Tatum's request in order to allow Dismukes to attend and participate.[25] Two other IEP meetings were held before agreement was reached on the services W.T. was to receive. During this period, the parties continued to litigate this lawsuit. Plaintiffs attempted to conduct settlement negotiations with defendants and requested formal mediation with a United States Magistrate Judge under the mediation auspices provided by this court.[26] Defendants filed a motion for summary judgment on October 4, 1995, and plaintiffs filed a response on October 20. W.T.'s IEP was signed and finalized on October 19, 1995. On October 26, 1995, while the summary-judgment motion was pending, the parties agreed that the substantive issues in this lawsuit were therefore moot, leaving only the issue of attorneys' fees and expenses.[27]

## II. DISCUSSION

### A.

The attorneys' fee provision of the IDEA gives this court discretion to "award reasonable attorneys' fees as part of the costs to the parents or guardian of a child or youth with a disability who is the prevailing party." 20 U.S.C.A. § 1415(e)(4). Defendants contend that plaintiffs are not "prevailing parties" in this litigation under the terms of the IDEA. The court will first consider whether plaintiffs are, in fact, prevailing parties for purposes of awarding attorneys' fees.

23. Plaintiffs' response to defendants' reply in opposition, at Exh. B (Multi–Eligibility Determination Committee report of August 9, 1995).

24. Plaintiffs' response to defendants, reply in opposition to fees and costs, at Exh. C (Aff. of Richard Dismukes).

25. Defendants' reply in opposition to fees and costs, at App. A (Aff. of Kay Donaldson).

A prevailing party must "receive at least some relief on the merits of his claim." *Texas State Teachers Ass'n v. Garland Independent School District,* 489 U.S. 782, 792, 109 S.Ct. 1486, 1493, 103 L.Ed.2d 866 (1989) (quoting *Hewitt v. Helms,* 482 U.S. 755, 107 S.Ct. 2672, 96 L.Ed.2d 654 (1987)) (describing the standard for determining "prevailing party" under Civil Rights Attorney's Fee Statute, 42 U.S.C.A. § 1988). The Eleventh Circuit Court of Appeals has long recognized a "catalyst" test to determine if a party has prevailed where no judicial relief is obtained. Under the catalyst theory, a plaintiff may be a prevailing party for the purposes of earning attorneys' fees if she can show that her lawsuit was a causal link prompting some remedial action. *See, e.g., Royal Crown Cola Co. v. Coca–Cola Co.,* 887 F.2d 1480, 1486 (11th Cir.1989) ("Nonetheless, even in the absence of judicial relief, a plaintiff may still be a prevailing party if the plaintiff can show that his or her lawsuit was a causal link prompting some remedial action.... Such a causal connection or link is established by evidence that the lawsuit was a substantial factor or a significant catalyst in motivating the defendants to end their unlawful behavior."), *cert. denied,* 497 U.S. 1011, 110 S.Ct. 3258, 111 L.Ed.2d 767 (1990); *Fields v. City of Tarpon Springs,* 721 F.2d 318, 321 (11th Cir.1983) ("To determine if a party has prevailed when there is no judicial relief this circuit has used the catalyst test. The catalyst test of prevailing party requires showing that the lawsuit is a causal link that prompted some remedial action."); *see also Gingras v. Lloyd,* 740 F.2d 210, 213 (2d Cir.1984) (Congress did not "intend[ ] that fees be awarded to a plaintiff ... who obtained only benefits that the defendant plainly would have conferred even in the absence of a lawsuit."); *American Constitutional Party v. Munro,* 650 F.2d 184, 188 (9th Cir.1981) ("[T]he courts have required consistently

26. *Id.* at Exh. A (Notice concerning settlement conference and mediation).

27. Order of November 1, 1995. In a companion order entered today, the court has denied defendants' summary judgment motion, and had dismissed all issues except the issue of plaintiffs's entitlement to attorneys' fees and expenses.

that plaintiffs seeking to qualify as 'prevailing parties' establish some sort of clear, *causal relationship* between the litigation brought and the practical outcome realized.") (emphasis in original).

Plaintiffs in this case concede that the relief they secured was not judicial in nature, but that defendants "voluntarily" changed their practice and granted W.T. the relief he desired. Therefore, plaintiffs are proceeding under this "catalyst" theory in their request for attorneys' fees and expenses.

There is some division among the Courts of Appeals as to whether the "catalyst" theory is still viable after the Supreme Court's decision in *Farrar v. Hobby*, 506 U.S. 103, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992). In *Farrar*, the Court addressed the proper standard to apply to a civil rights attorneys' fee claim under 42 U.S.C.A. § 1988 in a case where the plaintiffs sought monetary damages and were awarded only nominal damages. 506 U.S. at 106, 113 S.Ct. at 570. The Court stated that "to qualify as a prevailing party, a civil rights plaintiff must obtain at least some relief on the merits of his claim. The plaintiff must obtain an *enforceable judgment* against the defendant from whom fees are sought, or comparable relief through a consent decree or settlement." *Id.* at 111, 113 S.Ct. at 573 (emphasis added) (citations omitted).

An analysis of case law shows that—adhering to the Supreme Court's instruction that "it [is] generally undesirable, where holdings of the Court are not at issue, to dissect the sentences of the United States Reports as though they were the United States Code," *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515, 113 S.Ct. 2742, 2751, 125 L.Ed.2d 407 (1993)—most Courts of Appeals still support the catalyst theory in civil rights litigation. *See, e.g., Baumgartner v. Harrisburg Hous. Auth.*, 21 F.3d 541 (3rd Cir.1994); *Little Rock Sch. Dist. v. Pulaski County Special Sch. Dist., # 1*, 17 F.3d 260 (8th Cir.1994); *Craig v. Gregg County*, 988 F.2d 18 (5th Cir.1993); *Paris v. U.S. Dep't of Hous. and Urban Dev.*, 988 F.2d 236 (1st Cir.1993); *American Council of the Blind of Colorado, Inc. v. Romer*, 992 F.2d 249 (10th Cir.), *cert. denied*, 510 U.S. 864, 114 S.Ct.

184, 126 L.Ed.2d 143 (1993); *cf. S–1 and S–2 v. State Bd. of Education*, 21 F.3d 49 (4th Cir.) (en banc) (deeply divided (7 to 6) court held that, after *Farrar*, a person may not be a prevailing party under a catalyst theory for changes in the opposing party's conduct instigated after judgment or dismissal), *cert. denied*, 513 U.S. 876, 115 S.Ct. 205, 130 L.Ed.2d 135 (1994). The circuits that have continued to recognize the catalyst theory have generally held that *Farrar*'s holding is limited to the category of cases in which some formal relief has been obtained by a plaintiff but where a question remains as to whether the relief actually constitutes relief on the merits, as opposed to a "technical" relief that is insufficient to make a party genuinely "prevail." This reading of *Farrar* seems most consistent with the Supreme Court's line of attorneys' fee opinions, which has repeatedly "eschewed technical considerations" and instead taken a "result-oriented" approach to determining whether a party has prevailed for purposes of awarding attorneys' fees. *Baumgartner*, 21 F.3d at 548 (citing *Hewitt v. Helms*, 482 U.S. 755, 761, 107 S.Ct. 2672, 2676, 96 L.Ed.2d 654 (1987)); *Texas State Teachers Ass'n*, 489 U.S. at 789, 109 S.Ct. at 1489; *see also Hanrahan v. Hampton*, 446 U.S. 754, 757, 100 S.Ct. 1987, 1989, 64 L.Ed.2d 670 (1980) (noting language in legislative history of civil rights attorneys' fee statutes that "parties may be considered to have prevailed when they vindicate rights . . . without formally obtaining relief").

The Eleventh Circuit has not yet ruled on the fate of the catalyst theory after *Farrar*. *See Cullens v. Georgia Dep't of Transp.*, 29 F.3d 1489, 1494–95 and n. 4 (11th Cir.1994) (recognizing controversy over the continuing use of catalyst theory but explicitly declining to rule on it). At least two district courts in this circuit have relied on the catalyst theory in awarding attorneys' fees in the years after *Farrar*, however. *See, e.g., Southeastern Fisheries Ass'n v. Chiles*, 876 F.Supp. 270, 271 (S.D.Fla.1995) ("the sound legal analysis of the First, Third, Fifth, Eight and Tenth Circuits, holding that the catalyst theory is the proper standard to apply in determining the issue here presented, controls"); *Grinsted v. Houston County Sch. Dist.*, 826 F.Supp.

482, 485 (M.D.Ga.1993) (using catalyst test to grant attorneys' fees in IDEA case).

In addition and perhaps most importantly, the Eleventh Circuit's catalyst test has, if anything, only been called into question, not overruled, by the Supreme Court's decision in *Farrar*. In the Eleventh Circuit, "it is the firmly established rule ... that each succeeding panel is bound by the holding of the first panel to address an issue of law, unless and until that holding is overruled en banc, or by the Supreme Court." *United States v. Hogan*, 986 F.2d 1364, 1369 (11th Cir.1993). But more to the point, in *Florida League of Prof'l Lobbyists v. Meggs*, 87 F.3d 457, 462, cert. denied, ——— U.S. ———, 117 S.Ct. 516, 136 L.Ed.2d 405 (1996), the Eleventh Circuit observed that a court panel was "not at liberty to disregard binding case law that is so closely on point and has only been weakened." And more recently, in *United States v. Smith*, 122 F.3d 1355, 1359 (1997), the appellate court again made clear "that even where it has been weakened, but not overruled, by a Supreme Court decision, prior panel precedent must be followed." Indeed, some circuit law suggests that the Supreme Court holding and that of the prior panel decision must be irreconcilable in order for the latter to be ignored. *See Cottrell v. Caldwell*, 85 F.3d 1480, 1484–85 (11th Cir.1996) (Because the applicable prior circuit decisions "preceded [the Supreme Court decision] and cannot be reconciled with it," the Supreme Court decision must be followed.); *United States v. Shenberg*, 89 F.3d 1461, n. 23 (11th Cir.1996), cert. denied, ——— U.S. ———, 117 S.Ct. 961, 136 L.Ed.2d 847 (1997) (court declined to apply a prior panel decision in light of a more recent Supreme Court ruling that explicitly rejected the rationale underlying the prior decision). The foregoing cases, therefore, appear to establish that the mere weakening by the Supreme Court of a prior panel decision is insufficient to permit a later circuit panel, and by extension the trial courts within the circuit, to refrain from following the prior decision. Because the language in the *Farrar* opinion only weakened, if anything, circuit precedent for the catalyst test, that precedent is still binding.

Based on these considerations, this court concludes that the catalyst theory survives *Farrar* in the Eleventh Circuit, and that it is the appropriate tool with which to analyze plaintiffs' claim for attorneys' fees and expenses.

### B.

■ As stated, in order to show their entitlement to attorneys' fees and expenses under the IDEA, plaintiffs here must establish that their lawsuit was a causal link prompting the Andalusia City School System's decision to reevaluate W.T. for eligibility under the IDEA. *See Royal Crown Cola Co.*, 887 F.2d at 1486. At bottom, whether the final outcome is due to a plaintiff's efforts—that is, provoking a defendant into taking certain steps to bring itself into compliance with its legal duties—and, thus, whether plaintiff has prevailed, is an intensely factual, pragmatic issue. Clues to the provocative effects of the plaintiff's legal efforts are often best gleaned from the chronology of events, the nature of the relief sought and obtained, and the role of the plaintiff's action in activating the change. *Fields*, 721 F.2d at 321.

Here, the court must review, as a question of fact, whether the "action or proceeding" was a significant catalyst behind the IEP finally adopted and whether the relief attained alleviated the particular illegalities challenged by plaintiffs, that is, whether the plaintiffs' legal efforts were the cause in fact of the steps the Andalusia City School System took to bring itself into compliance with a colorable view of federal law. *Posada v. Lamb County*, 716 F.2d 1066, 1072–73 (5th Cir.1983). Such evidence can include testimony that specific decisions regarding W.T. were influenced by the ongoing litigation, or other evidence indicating that the "totality of the circumstances" supports a causation theory, including the nature of the relief obtained, the chronology of events, and the role of the litigation. *Royal Crown Cola Co.*, 887 F.2d at 1487.

Looking at the nature of the relief, the court must consider first whether plaintiffs' goals in the litigation were accomplished. There is no doubt that plaintiffs' primary goals in this litigation were met. In their

complaint, plaintiffs requested relief including declaratory relief, implementation of an appropriate IEP, and procedures for identifying other students who have Attention Deficit Hyperactive Disorder and may be eligible for assistance under IDEA or other programs. W.T. has been declared disabled and eligible for assistance under the IDEA and has received this assistance. Further, the school system has hired an additional emotional-conflict teacher at W.T.'s school. This is sufficient to show that plaintiffs obtained the relief they wanted.

To recover attorneys' fees after the defendant has voluntarily agreed to the relief sought, a plaintiff must also show that she had a "colorable claim" or "reasonable likelihood of success on the merits." *Ketterle v. B.P. Oil. Inc.*, 909 F.2d 425, 429 (11th Cir. 1990). Defendants contend that plaintiffs have not presented a "colorable claim" that Tatum had standing at the time this lawsuit was filed. The court disagrees. First, Tatum maintained her parental rights at all times, and the state court order giving temporary custody to W.T.'s half-sister specifically indicated that Tatum maintained her right to attend any meetings regarding W.T.'s education and that she had the right to authorize release of his records. Therefore, Tatum's right to participate in the education of her child had not been cut off. This makes compelling sense because W.T.'s half-sister had only temporary custody, and the ultimate and long-term responsibility for W.T.'s welfare still remained with Tatum. Indeed, it would have been severely destructive to W.T.'s welfare not to involve Tatum in his educational program, for when Tatum resumed custody of W.T.—a reasonable presumption until her parental rights had been terminated, since the duty of the Human Resources Department is to see if family circumstances can be improved as to keep children with their parents—she would have to be ready to pick up where W.T.'s half-sister left off with regard to the day-to-day personal and intimate care of W.T. Under comparable circumstances, courts have allowed non-custodial parents to assert educational claims on behalf of their children. *See, e.g., In Interest of J.D.*, 510 So.2d 623 (Fla.Dist.Ct.App.1987); *Doe v. Anrig*, 651 F.Supp. 424, 428 (D.Mass.1987).

Further, the plain language of the IDEA—in particular, 20 U.S.C.A. § 1415(b)(2)—provides that "the parents or guardian shall have an opportunity for an impartial due process hearing." Therefore, under its plain language, the IDEA gives to the "parents or guardian" of a child—regardless as to whether the parent or guardian has actual custody—the right to request a due-process hearing. *Ardestani v. I.N.S.*, 502 U.S. 129, 135, 112 S.Ct. 515, 520, 116 L.Ed.2d 496 (1991) ("The 'strong presumption' that the plain language of the statute expresses congressional intent is rebutted only in 'rare and exceptional circumstances.'") (quoting *Rubin v. United States*, 449 U.S. 424, 430, 101 S.Ct. 698, 701, 66 L.Ed.2d 633 (1981)). Because Tatum was always W.T.'s parent, she arguably had the authority to request a due-process hearing for him. The fact that the custodial guardian at the time of the administrative proceedings disagreed with Tatum did not necessarily abrogate Tatum's standing to request an administrative determination of W.T.'s disability status. *See, e.g., Anrig*, 651 F.Supp. at 429.

Finally and most importantly, it should be remembered that, under the IDEA, the Andalusia City School System's statutory duty was not only to allow the participation of W.T.'s guardian or parent (that is, whether Tatum or Worley), but to assure in any event that W.T. was provided with an "appropriate public education." 20 U.S.C.A. § 1412(1). The fact that W.T.'s custodial guardian was satisfied with what Andalusia City School System had done did not relieve the school system of its own independent obligation to assess W.T. for special education. Similarly, the fact that W.T.'s custodial guardian—who, importantly was only a temporary one—was satisfied with Andalusia City School System had done did not relieve W.T.'s parent—who still had permanent and long-term responsibility for W.T.—of her obligation to do all within her power to make sure W.T. received all to which he was entitled under the IDEA.

The court should not be understood to say that whether a parent or guardian is custodial is immaterial. To the contrary, it is very

important; it is just not necessarily determinative. A non-custodial parent's interest in the education of her child may be so attenuated that her comments about the welfare of the child are of no value. But a parent, albeit a non-custodial one, may have displayed such longstanding and responsible interest in the education and personal life of her child, that what she has to offer about the welfare of the child could be of great value to a school system, a due-process hearing officer, and a court. Whether a parent or guardian has custody of a child is one of many factors to be considered under the IDEA. It does not, by itself, confer or defeat standing, however.

■ Defendants contend that plaintiffs are not entitled to attorneys' fees and expenses because they failed to exhaust administrative remedies before appealing to this court as required under 20 U.S.C.A. § 1415(b), (c), and (e). Again, plaintiffs have presented, at least, a colorable claim that exhaustion was not necessary. The due-process hearing officer dismissed Tatum's original request for a due-process hearing for lack of standing, citing her want of physical custody over W.T. at the time the hearing was to be held. After the due-process request was dismissed, plaintiffs filed this lawsuit in federal court, and shortly afterwards, custody of W.T. was restored to Tatum. Defendants contend that plaintiffs should have refiled a request for due-process hearing after Tatum regained custody in order to fulfill IDEA's requirement for exhaustion of administrative remedies. However, plaintiffs filed their complaint in federal court before Tatum regained physical custody of W.T., and therefore Tatum had exhausted administrative remedies in her status as a noncustodial parent, the specific capacity in which Tatum sought at the time to seek judicial review of school system's treatment of W.T. Therefore, when this case was initially filed, it was properly before the court.

Nor was it necessarily incumbent on plaintiffs, once Tatum had regained custody of W.T. and thus the issue of her standing had become moot, to withdraw their federal lawsuit and refile a due-process request at the administrative level. "The exhaustion requirement ... is not jurisdictional and therefore 'is not to be applied inflexibly.'" *N.B. v. Alachua County Sch. Bd.*, 84 F.3d 1376, 1379 (11th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 769, 136 L.Ed.2d 715 (1997) (quoting *McGee v. United States*, 402 U.S. 479, 483, 91 S.Ct. 1565, 1568, 29 L.Ed.2d 47 (1971)). Specifically, the Eleventh Circuit has repeatedly held that exhaustion of administrative remedies is not required where it would be futile. *See, e.g., id.; Association for Retarded Citizens of Alabama v. Teague*, 830 F.2d 158, 160 (11th Cir.1987). W.T.'s physical custody had changed numerous times between February and June 1995, and it continued to change during the summer of 1995. Had Tatum returned to the administrative forum, she may well have had her complaints repeatedly dismissed every time W.T.'s custody was modified. Such an effort to have the due-process officer reach the merits of W.T.'s claim would have appeared to have been futile at the time Tatum filed for judicial review in federal court.

In any event, even if the court should have required that plaintiffs return to the due-process hearing officer, plaintiffs would still be entitled to attorneys' fees and expenses, assuming all other requirements for such are satisfied. A plaintiff is entitled to attorneys' fees and expenses for work done not only in court but for that done before a due-process hearing officer. *Mitten v. Muscogee County School District*, 877 F.2d 932, 935 (11th Cir. 1989), *cert. denied*, 493 U.S. 1072, 110 S.Ct. 1117, 107 L.Ed.2d 1024 (1990) (The IDEA "provides attorneys fees to the prevailing party in administrative actions."). Therefore, plaintiffs would still have been entitled to attorneys' fees and expenses had they returned to the due-process hearing officer and reached their settlement in that setting.

■ Having addressed Tatum's standing claim, the court must now consider whether plaintiffs' substantive claim was colorable. The court must conclude that it was, since the Andalusia City School System subsequently voluntarily provided the majority of the relief requested of this court. Of course the court is mindful that the exact disability status of an emotionally-conflicted teenager with Attention Deficit Hyperactive Disorder

may be a moving target. In other words, W.T.'s impairment may have been changing during the period that this litigation was playing out, and the school system may have responded in the fall of 1995 to a worsening situation. Nonetheless, school counselor Kay Donaldson admitted in her affidavit that the school system's decision to reevaluate W.T. was at least partially based on the Vaughan Clinic report dated May 30, 1995, and W.T.'s Multi–Eligibility Determination Committee determination of eligibility itself cites to Dismukes's April 6, 1995, report. The due-process hearing was scheduled for May 18, 1995, and this lawsuit was filed June 6, 1995. In other words, the very evaluations that defendants relied on to show that W.T. was entitled to services under the IDEA were completed or in process before this lawsuit was ever filed. These facts lead the court to conclude that plaintiffs had at least a colorable legal claim to special education services at the time the complaint was filed.

The court next considers the chronology of events to determine whether there is a causal connection between this litigation and the desired relief. *Royal Crown Cola Co.,* 887 F.2d at 1487. While the chronology of events is important, it is not definitive because the question of causation is intensely factual. *Id.; Posada,* 716 F.2d at 1072. The chronology of events in this case is strong evidence that the litigation served as a catalyst. According to the evidence, Tatum began urging the Andalusia City School System in 1993 that W.T. should be IDEA-eligible. She again requested an IEP in January 1995. In March 1995, her attorneys contacted the school system requesting an IEP and filed for a due-process hearing. In April 1995, defendants were still resisting Tatum's efforts, filing motions to dismiss her due-process request. This lawsuit was filed in June 1995, and defendants agreed that W.T. was IDEA-eligible in August 1995. The relative proximity of defendants' reassessment of W.T. to the filing of the federal suit, following a lengthy period of inactivity or active resistance from the Andalusia City School System is compelling evidence that the law-

suit had an effect on defendants' granting the requested relief.

Lastly, the court must look at the totality of the circumstances to determine what role the litigation played in defendants' remedial action. *Royal Crown Cola Co.,* 887 F.2d at 1487 (citing *Braafladt v. Board of Governors,* 778 F.2d 1442, 1444 (9th Cir.1985)). There is no "smoking gun" in this case, no memorandum or note that definitively reveals the motivations behind the Andalusia City School System's willingness to reconsider an IEP for W.T. Indeed, it would be unrealistic to expect that such a thing would exist. However, documentation on W.T.'s Multi–Eligibility Determination Committee report indicates that the designation of his emotional impairment was at least partially based on the April 6, 1995, report of Dismukes, who became involved with W.T. at the request of plaintiffs' attorneys in furtherance of this litigation. In addition, Dismukes appears to have played a significant role in determining exactly which services the school system was obliged to offer W.T. in his IEP.

The law does not require plaintiffs to show that their litigation was the only cause of the Andalusia City School System's actions; the catalyst theory merely requires that they show that the litigation "played a substantial role" in the defendants' remedial action. *Royal Crown Cola Co.,* 887 F.2d at 1486. Motivation "is frequently multipurposed." *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.,* 429 U.S. 252, 265 n. 11, 97 S.Ct. 555, 563 n. 11, 50 L.Ed.2d 450 (1977). The removal, therefore, of even a "'subordinate' purpose" may change the outcome. *Id.* W.T.'s worsening behavior may have played a role in the school system's decision. The Human Resources Department's decision to have W.T. assessed by the Vaughan Clinic may have contributed as well. Nonetheless, plaintiffs have met their burden in showing that this litigation also played a substantial, catalytic role in obtaining relief.[28]

### III. CONCLUSION

For the above reasons, plaintiffs are prevailing parties in this litigation and are thus

---

28. Indeed, for the above reasons, the court is convinced that, but for this litigation, defendants would not have settled the substantive matters raised in this lawsuit.

entitled to reasonable attorneys' fees and expenses.[29] An appropriate judgment will be entered, finding that plaintiffs are entitled to reasonable attorneys' fees and expenses and setting a deadline by which the parties are to submit additional information on what is reasonable.

---

29. This case, therefore, differs from the court's recent decision in *W.L.G. v. Houston County Board of Education*, 975 F.Supp. 1317, (M.D.Ala. 1997). There, plaintiffs were not entitled to attorneys' fees and expenses under the catalyst theory because they filed their IDEA lawsuit before ever giving the school system a reasonable opportunity to consider their concerns. The court explained:

"The IDEA provides for the award of attorneys' fees only 'if an action or proceeding' is brought under the Act; the Act does not provide for fees for actions preliminary, but necessary, to such an action or proceeding. It is implicit from this procedural structure that, before a school system can be saddled with attorneys' fees, the school system must have done something to warrant the 'action or proceeding,' and, of course, the school system cannot have done something to warrant the 'action or proceeding' unless and until the complainant has presented to it a claim which it has rejected or otherwise inadequately addressed. To read the Act otherwise would be to pervert it, for such a reading would allow a complainant to pervert 'all' conduct by a school board into an 'action or proceeding,' bringing with it an entitlement to attorneys' fees, simply by requesting a due-process hearing, regardless as to whether the circumstances had reached the appropriate evolutionary point that would warrant or justify a due-process hearing. Here, [plaintiffs] never gave the Houston County School Board an opportunity to reject or otherwise fail to address adequately their concerns before requesting a due-process hearing. In other words, circumstances had not reached a point where a due-process hearing was warranted."
*Id.* at 1325.