Arthur SUMBRY, et al., Plaintiffs,

v.

**RUSSELL COUNTY, ALABAMA, et al., Defendants.**

Civil Action No. 84–T–1386–E.

United States District Court, M.D. Alabama, Eastern Division.

Feb. 10, 1998.

James U. Blacksher, Birmingham, AL, Terry G. Davis, Terry G. Davis, P.C., Montgomery, AL, Larry T. Menefee, Montgomery, AL, Edward Still, Lawyers' Committee for Civil Rights Under Law, Washington, DC, for Plaintiffs.

Algert S. Agricola, Jr., Wallace, Jordan, Ratliff & Brandt, L.L.C., Montgomery, AL, Albert L. Jordan, Wallace, Jordan, Ratliff & Brandt, L.L.C., Birmingham, AL, Intervenor-Plaintiff.

Ronald G. Davenport, Robert A. Huffaker, Rushton, Stakely, Johnston & Garrett, Montgomery, AL, Bart Gregory Harmon, James W. Webb, Pamela Robinson Higgins, Webb & Eley, P.C., Montgomery, AL, for Defendants.

## ORDER

MYRON H. THOMPSON, Chief Judge.

Plaintiffs Arthur Sumbry, Joseph Ivey, and John Battle filed this lawsuit in 1984 on behalf of a class of African–American citizens of Russell County, Alabama against Russell County, the members of the Russell County Commission (the "Commission"), and the election officials of Russell County,[1] alleging that Russell County's at-large election system diluted and abridged the voting rights of black citizens, in violation of the § 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C.A. § 1973. A consent decree was entered by the court on March 17, 1986, altering the size of the Commission and the nature of its election system. On April 15, 1997, Andrew Pitts, a white resident of Russell County, was allowed to intervene as a plaintiff, and on October 31, 1997, the court entered a final judgment in this action.

The lawsuit is currently before the court on the motion for award of reasonable attorneys' fees and costs filed by Pitts on November 14, 1997. For the reasons that follow, the court will deny the motion.

---

1. For the sake of clarity, the court will refer to the Russell County Commission as "the Commission" throughout this order, and will refer to Russell County, its election officials, and the members of the Commission, collectively, as "the defendants."

## I. BACKGROUND

Because familiarity with the chronology of pertinent events in this lawsuit is crucial to the resolution of the attorneys' fees issue, a summary of this chronology is set forth below.

- Following a separate and earlier, 1972 lawsuit challenging the constitutionality of 1949 Ala. Acts 520, which set the size of the Commission at three members, with each member be elected at-large, this court entered a final order declaring the system unconstitutional, and mandating that the county commission be increased in size from three to five members elected at-large.

- On October 30, 1984, the plaintiffs, a class of black citizens of Russell County, brought the present lawsuit against the defendants, alleging that the County's at-large election system diluted and abridged the voting rights of black citizens, in violation of the § 2 of the Voting Rights Act of 1965.

- On March 17, 1986, this court entered a consent decree reciting the parties' agreement to the entry of a permanent injunction that provided for an increase in Commission membership from five to seven, each member to be elected from a single-member election district. Pursuant to the consent decree, the Commission was also permanently enjoined from conducting at-large elections for members.

- In 1992, the Alabama legislature enacted legislation, 1975 Ala.Code § 11–3–1.1(a) (Michie Supp.1996), authorizing certain county commissions to alter the boundaries of single-member districts, following any federal decennial census. On November 8, 1995, pursuant to that act, and in view of the 1990 federal census data, the Commission redrew its district boundaries. The new plan received § 5 preclearance from the United States Department of Justice on February 14, 1996.

- By letter dated February 28, 1997, counsel for plaintiff-intervenor Andrew Pitts, a white Russell County resident, informed the Commission that they believed that this court's 1972 and 1986 orders increasing the Commission's size and altering its election system contravened federal law because they were primarily racially motivated. Pitts's counsel also expressed their opinion that the districting plan adopted by the Commission in 1995 perpetuated those violations of federal law. The letter further urged that the Commission initiate action to accomplish the following objectives: (1) to obtain relief from this court's judgment implementing both the seven and five-member districting plans; (2) to obtain court approval to adopt a districting plan containing districts for a three-member commission, as required by 1949 Ala. Acts 520. Pitts's counsel warned that they would "initiate proceedings to accomplish this result" should they not hear from the Commission's counsel by March 15, 1997.

- On March 12, 1997, the Commission adopted a unanimous resolution petitioning the Alabama legislature to enact legislation that would statutorily fix the number of Russell County commissioners at seven, each to be elected from a single-member district.[2]

- On March 17, 1997, Pitts filed a motion for post-judgment intervention in this lawsuit, which was granted on April 15, 1997. On that same date, Pitts filed his original com-

---

**2.** The resolution reads, in pertinent part, as follows:

"RESOLUTION

"WHEREAS, the County Commission of Russell County by prior statute had only three (3) members from districts fixed by statute; and

"WHEREAS, as a result of two separate judgments of the United States District Court for the Middle District of Alabama, the County Commission of Russell County was increased from three (3) to seven (7) members, each to be elected from a single-member district; and

"WHEREAS, Russell County has now been threatened with further litigation; and

"WHEREAS, the County Commission finds that seven (7) members presents a better working commission more representative of the diverse population of the County.

"NOW, THEREFORE, BE IT RESOLVED that the County Commission of Russell County, Alabama hereby petitions the Legislature of Alabama to enact legislation that would statutorily fix the number of county commissioners of Russell County at seven (7), each to be elected from a single-member district.

"BE IT FURTHER RESOLVED by the County Commission that this petition be adopted and presented forthwith to the legislative delegation representing Russell County."

plaint-in-intervention in this action, challenging the Commission's use of race in formulating its 1995 districting plan, and urging the court to vacate the 1972 and 1986 injunctions. Pitts also sought a court order directing that a new districting plan be drafted, as well as additional injunctive relief, costs and attorneys' fees. Pitts filed an amended complaint on April 22, 1997.

- On May 29, 1997, the governor of Alabama signed into law 1997 Ala. Acts 680, which fixed the size of the Russell County Commission at its then-current size of seven members, each elected from a single-member district. The act received § 5 preclearance from the United States Department of Justice on October 6, 1997.

- On October 31, 1997, in view of the enactment of 1997 Ala. Acts 680 and its preclearance by the Department of Justice, the court entered a final judgment in this lawsuit terminating the 1986 consent decree and dismissing the lawsuit in its entirety.

- On November 14, 1997, Pitts filed the pending motion for award of reasonable attorneys' fees and costs.

## II. DISCUSSION

### A.

Under 42 U.S.C.A. § 1973*l* (e) (West 1994), courts are authorized to award reasonable attorneys' fees to prevailing litigants under the Voting Rights Act. In addition, 42 U.S.C.A. § 1988(b) (West 1994) provides for the awarding of reasonable attorneys' fees to a party prevailing in a claim under 42 U.S.C.A. § 1983 (West 1994).

The primary issue raised by Pitts's motion is whether he is a 'prevailing party' for purposes of awarding attorneys' fees under these two statutory provisions.[3] Pitts maintains that he is a prevailing party because his actions in this lawsuit resulted in the achievement of at least some of his litigation objectives. As will be seen, however, the court finds that Pitts is not a prevailing party because, even if he did in fact obtain some measure of his desired relief, the filing of his complaint-in-intervention and his actions in this litigation were not causal links that led to this result, as is required by the pertinent case law.[4]

A prevailing party must "receive at least some relief on the merits of his claim." *Texas State Teachers Ass'n v. Garland Independent School District,* 489 U.S. 782, 792, 109 S.Ct. 1486, 1493, 103 L.Ed.2d 866 (1989) (quoting *Hewitt v. Helms,* 482 U.S. 755, 107 S.Ct. 2672, 96 L.Ed.2d 654 (1987)). The Eleventh Circuit Court of Appeals has long recognized a "catalyst" test to determine if a party has prevailed where no judicial relief is obtained. Under the catalyst theory, a plaintiff may be a prevailing party for purposes of earning attorneys' fees if he can show that his lawsuit was a causal link prompting the defendants to take appropriate remedial action which in some way vindicates the claim asserted by plaintiff. *See, e.g., Royal Crown Cola Co. v. Coca–Cola Co.,* 887 F.2d 1480, 1486 (11th Cir.1989) ("Nonetheless, even in the absence of judicial relief, a plaintiff may still be a prevailing party if the plaintiff can show that his or her lawsuit was a causal link prompting some remedial action.... Such a causal connection or link is established by evidence that the lawsuit was a substantial factor or a significant catalyst in motivating the defendants to end their unlawful behavior."), *cert. denied,* 497 U.S. 1011, 110 S.Ct. 3258, 111 L.Ed.2d 767 (1990); *Fields v. City of Tarpon Springs,* 721 F.2d 318, 321 (11th Cir.1983) ("To determine if a party has prevailed when there is no judicial relief this

---

**3.** In addition to contesting Pitts's status as a prevailing party, the defendants contend that Pitts does not have standing in this lawsuit, and therefore is ineligible for attorneys' fees and costs under the relevant statutory provisions. However, because the court concludes that Pitts is not a prevailing party, it need not reach the standing issue.

**4.** The defendants contend not that Pitts is unable to demonstrate the requisite causal connection between his actions in this lawsuit and the relief obtained, but rather that he cannot establish prevailing party status because he has wholly failed to achieve any of his actual, express objectives. As explained below, the court will not address whether Pitts has in fact accomplished his litigation objectives, because, even assuming he has done so, it finds that Pitts's intervention in this lawsuit was not a substantial factor or significant catalyst in causing that result. Absent such a causal connection, Pitts cannot be a prevailing party for purposes of obtaining a fee award.

circuit has used the catalyst test. The catalyst test of prevailing party requires showing that the lawsuit is a causal link that prompted some remedial action."); *see also Gingras v. Lloyd,* 740 F.2d 210, 213 (2d Cir.1984) (Congress did not "intend[ ] that fees be awarded to a plaintiff . . . who obtained only benefits that the defendant plainly would have conferred even in the absence of a lawsuit."); *American Constitutional Party v. Munro,* 650 F.2d 184, 188 (9th Cir.1981) ("[T]he courts have required consistently that plaintiffs seeking to qualify as 'prevailing parties' establish some sort of clear, *causal relationship* between the litigation brought and the practical outcome realized.") (emphasis in original).

Here, Pitts is proceeding under this "catalyst" theory in his request for attorneys' fees and expenses. Specifically, he contends that his efforts in this litigation spurred the Commission to seek passage of legislation that would statutorily fix the size of the Commission, thus mooting the current controversy and leading the court to terminate the 1986 consent decree and to dismiss the lawsuit in its entirety.[5]

As this court recently noted in *W.T. v. Andalusia City Schools,* 977 F.Supp. 1437 (M.D.Ala.1997) (Thompson, J.), there is some division among the Courts of Appeals as to whether the "catalyst" theory is still viable after the Supreme Court's decision in *Farrar v. Hobby,* 506 U.S. 103, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992). In *Farrar,* the Court addressed the proper standard to apply to a civil rights attorneys' fee claim under 42 U.S.C.A. § 1988 in a case where the plaintiffs sought monetary damages and were awarded only nominal damages. 506 U.S. at 106, 113 S.Ct. at 570. The Supreme Court stated that "to qualify as a prevailing party, a civil rights plaintiff must obtain at least some relief on the merits of his claim. The plaintiff must obtain an *enforceable judgment* against the

defendant from whom fees are sought, or comparable relief through a consent decree or settlement." *Id.* at 111, 113 S.Ct. at 573 (emphasis added) (citations omitted).

An analysis of case law shows that—adhering to the Supreme Court's instruction that "it [is] generally undesirable, where holdings of the Court are not at issue, to dissect the sentences of the United States Reports as though they were the United States Code," *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 515, 113 S.Ct. 2742, 2751, 125 L.Ed.2d 407 (1993)—most Courts of Appeals still support the catalyst theory in civil rights litigation. *See, e.g., Baumgartner v. Harrisburg Housing Authority,* 21 F.3d 541 (3rd Cir. 1994); *Little Rock Sch. Dist. v. Pulaski County Special Sch. Dist., # 1,* 17 F.3d 260 (8th Cir.1994); *Craig v. Gregg County,* 988 F.2d 18 (5th Cir.1993); *Paris v. U.S. Dept. of Housing and Urban Development,* 988 F.2d 236 (1st Cir.1993); *American Council of the Blind, Inc. v. Romer,* 992 F.2d 249 (10th Cir.), *cert. denied,* 510 U.S. 864, 114 S.Ct. 184, 126 L.Ed.2d 143 (1993); *but cf. S–1 and S–2 v. State Bd. of Education,* 21 F.3d 49 (4th Cir.) (en banc) (deeply divided (7 to 6) court held that, after *Farrar,* a person may not be a prevailing party under a catalyst theory for changes in the opposing party's conduct instigated *after* judgment or dismissal), *cert. denied,* 513 U.S. 876, 115 S.Ct. 205, 130 L.Ed.2d 135 (1994). The Courts of Appeals that have continued to recognize the catalyst theory have generally held that *Farrar's* holding is limited to the category of cases in which some formal relief has been obtained by a plaintiff but where a question remains as to whether the relief actually constitutes relief on the merits, as opposed to a "technical" relief that is insufficient to make a party genuinely "prevail." This reading of *Farrar* seems most consistent with the Supreme Court's line of attorneys'

---

5. At first blush, this case appears to represent a departure from the prototypical 'catalyst' scenario, in which the relief secured by the party seeking its attorneys' fees is entirely extra-judicial in nature, because here Pitts contends that the court did grant him at least a portion of his requested relief by terminating the 1986 consent decree. However, as explained below, the court terminated the consent decree solely because the state legislature, at the Commission's prompting,

statutorily fixed the Commission's size and election system, thus obviating the necessity for the consent decree and mooting this litigation. Thus, to the extent that Pitts obtained his requested relief, this result stemmed from the voluntary efforts of the Commission and state legislature. Accordingly, the court concludes that Pitts does in fact rely upon the catalyst theory in seeking attorneys' fees and expenses.

fee opinions, which has repeatedly "eschewed technical considerations" and instead taken a "result-oriented" approach to determining whether a party has prevailed for purposes of awarding attorneys' fees. *Baumgartner,* 21 F.3d at 548 (citing *Hewitt v. Helms,* 482 U.S. 755, 761, 107 S.Ct. 2672, 2676, 96 L.Ed.2d 654 (1987); *Texas State Teachers Ass'n,* 489 U.S. at 789, 109 S.Ct. at 1489; *see also Hanrahan v. Hampton,* 446 U.S. 754, 757, 100 S.Ct. 1987, 1989, 64 L.Ed.2d 670 (1980) (noting language in legislative history of civil rights attorneys' fee statutes that "parties may be considered to have prevailed when they vindicate rights ... without formally obtaining relief").

The Eleventh Circuit has not yet ruled on the fate of the catalyst theory after *Farrar. See Cullens v. Georgia Dept. of Transp.,* 29 F.3d 1489, 1494–95 and n. 4 (11th Cir.1994) (recognizing controversy over the continuing use of catalyst theory but explicitly declining to rule on it). At least three district courts in this circuit, including this one, have relied on the catalyst theory in awarding attorneys' fees in the years after *Farrar,* however. *See, e.g., W.T. v. Andalusia City Schools, supra; Southeastern Fisheries Ass'n v. Chiles,* 876 F.Supp. 270, 271 (S.D.Fla.1995) ("the sound legal analysis of the First, Third, Fifth, Eight and Tenth Circuits, holding that the catalyst theory is the proper standard to apply in determining the issue here presented, controls"); *Grinsted v. Houston County School District,* 826 F.Supp. 482, 485 (M.D.Ga.1993) (using catalyst test to grant attorneys' fees in IDEA case).

■ In addition and perhaps most importantly, the Eleventh Circuit's catalyst test has, if anything, only been called into question, not overruled, by the Supreme Court's decision in *Farrar.* In the Eleventh Circuit, "it is the firmly established rule ... that each succeeding panel is bound by the holding of the first panel to address an issue of law, unless and until that holding is overruled en banc, or by the Supreme Court." *United States v. Hogan,* 986 F.2d 1364, 1369 (11th Cir.1993). But more to the point, in *Florida League of Prof'l Lobbyists v. Meggs,* 87 F.3d 457, 462, *cert. denied,* —— U.S. ——, 117 S.Ct. 516, 136 L.Ed.2d 405 (1996), the Eleventh Circuit observed that a court panel was "not at liberty to disregard binding case

law that is so closely on point and has only been weakened." And more recently, in *United States v. Smith,* 122 F.3d 1355, 1359 (11th Cir.1997), the appellate court again made clear "that even where it has been weakened, but not overruled, by a Supreme Court decision, prior panel precedent must be followed." Indeed, some circuit law suggests that the Supreme Court holding and that of the prior panel decision must be irreconcilable in order for the latter to be ignored. *See Cottrell v. Caldwell,* 85 F.3d 1480, 1484–85 (11th Cir.1996) (because the applicable prior circuit decisions "preceded [the Supreme Court decision] and cannot be reconciled with it," the Supreme Court decision must be followed.); *United States v. Shenberg,* 89 F.3d 1461, n. 23 (11th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 961, 136 L.Ed.2d 847 (1997) (court declined to apply a prior panel decision in light of a more recent Supreme Court ruling that explicitly rejected the rationale underlying the prior decision). The foregoing cases, therefore, appear to establish that the mere weakening by the Supreme Court of a prior panel decision is insufficient to permit a later circuit panel, and by extension the trial courts within the circuit, to refrain from following the prior decision. Because the language in the *Farrar* opinion only weakened, if anything, circuit precedent for the catalyst test, that precedent is still binding.

Based on these considerations, this court concludes again, as it did in *W.T. v. Andalusia City Schools, supra,* that the catalyst theory survives *Farrar* in the Eleventh Circuit, and that it is the appropriate tool with which to analyze plaintiffs' claim for attorneys' fees and expenses.

### B.

As stated, to demonstrate entitlement to attorneys' fees and expenses under §§ 1973*l* (e) and 1988 as a prevailing party, a plaintiff must establish that his or her lawsuit was a causal link that prompted some remedial action. *See Royal Crown Cola Co.,* 887 F.2d at 1486. "At bottom, whether the final outcome is due to a plaintiff's efforts—that is, provoking a defendant into taking certain steps to bring itself into compliance with its legal

duties—and, thus, whether plaintiff has prevailed, is an intensely factual, pragmatic issue." *W.T.*, 977 F.Supp. at 1443. "Clues to the provocative effects of the plaintiff's legal efforts are often best gleaned from the chronology of events, the nature of the relief sought and obtained, and the role of the plaintiff's action in activating the change." *Id.*

Moreover, the law does not require a plaintiff to show that his litigation was the only cause of the defendants' action; "the catalyst theory merely requires that [the plaintiff] show that the litigation 'played a substantial role' in the defendants' remedial action." *Id.* at 1466 (quoting *Royal Crown Cola Co.*, 887 F.2d at 1486). "Motivation 'is frequently multipurposed.' *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 265 n. 11, 97 S.Ct. 555, 563 n. 11, 50 L.Ed.2d 450 (1977). The removal, therefore, of even a ' "subordinate" purpose' may change the outcome. *Id.*" *W.T.*, 977 F.Supp. at 1446.

■ The parties do not dispute that Pitts's *pre-litigation* actions were a causal link prompting the Commission to seek the enactment of the Alabama legislation that codified the Commission's current size and election system, and eventually led to the court's termination of the 1986 consent decree and dismissal of this lawsuit. In fact, the parties have stipulated that the February 28, 1997, letter from Pitts's counsel to the Commission "was the causal connection or catalyst in motivating" the Commission to pass the March 12, 1997, resolution in which they petitioned the state legislature to enact such legislation.[6] However, as the foregoing authorities establish, the critical question here is whether Pitts's actions *in this lawsuit*— that is, the actual filing of his complaint-in-intervention, submission of any pre-trial motions in the case, efforts to resolve the issues in controversy by negotiation, etc.—prompted the Commission to seek enactment of the legislation that mooted the lawsuit. Conversely, the question is not whether Pitts's pre-litigation efforts to spur the Commission into action by raising the specter of a lawsuit

led ultimately to passage of the litigation-mooting legislation.

Examination of the record demonstrates that Pitts has not satisfied his burden of establishing that his participation in this litigation had a catalytic effect on the Commission's actions in seeking codification of the current election system. The letter from Pitts's counsel to the Commission threatening litigation was sent on February 28, 1997, and the Commission adopted the resolution petitioning the Alabama legislature to enact the litigation-mooting legislation on March 12, 1997, *prior to the filing of Pitts's complaint-in-intervention.* As the undisputed record establishes, it was the adoption of this resolution, followed by the introduction of a bill based upon the resolution by a representative of Russell County in the state legislature, that ultimately led to passage of the legislation. Aside from a conclusory and unsubstantiated assertion that it is "very likely" that the legislation would not have passed absent the "prodding" supplied by Pitts's actions in this lawsuit,[7] Pitts points to no evidence suggesting that the course of events set in motion by passage of the Commission's resolution would not have culminated in enactment of the state legislation absent Pitts's intervention in this lawsuit.

Courts faced with analogous scenarios in which the defendant has already taken substantial steps towards remedial action by the time the complainant filed his or her lawsuit have likewise denied the complainant prevailing party status. For instance, in *Craig v. Gregg County*, 988 F.2d 18 (5th Cir.1993), the Fifth Circuit affirmed the denial of attorneys' fees to a plaintiff in a Voting Rights Act case whose claim proceeded under the catalyst theory. The plaintiff had obtained neither an enforceable judgment nor a consent decree or other settlement, but contended that he was a prevailing party because the defendant county had ultimately developed a districting plan that complied with the Act and satisfied the plaintiff's concerns. Although it was not until after the plaintiff brought suit that the county had developed the plan and

---

6. Stipulation between plaintiff-intervenor and defendant Russell County Commission, filed on Nov. 14, 1997 (Doc. no. 77), at 1–2.

7. Pl.–Interv.'s reply brief on attorneys' fees, filed on January 9, 1998 (Doc. no. 86), at 6–7.

submitted it to the Department of Justice for preclearance, the court refused to deem the plaintiff a prevailing party absent any evidence that his suit spurred the county to develop the plan. *Id.* at 21. Specifically, the court noted that by the time the plaintiff filed suit in district court, the county had already presented the proposed voting scheme to the Department of Justice, and had also filed suit in the District of Columbia seeking a declaration that the proposed scheme was free from discriminatory purpose and effect. *Id.* at 19, 21. Borrowing language from an earlier Fifth Circuit decision, the *Craig* court noted that "Late arrivers cannot jump the train as it leaves the station and hope to seize prevailing plaintiff status." *Id.* at 21 (citing *Posada v. Lamb County,* 716 F.2d 1066, 1071 (5th Cir.1983)). Without evidence to the contrary, the court concluded, "it may be inferred that the train had been moving toward revision from the time the County submitted the original districting plan to the Department of Justice for approval." *Id.* In other words, the court would not award the plaintiff attorneys' fees "for demanding that [the county] do something that it was going to do anyway." *Id.*

The district court in *Jackson v. Stevenson,* 666 F.Supp. 99 (S.D.Miss.1986) reached a similar conclusion where the stipulated facts showed that, even before the plaintiffs filed suit challenging the defendant county board of supervisor's failure to adopt a redistricting plan, the board had "already begun the process of redistricting and that [it] conscientiously strove toward that end regardless of plaintiffs' actions." 666 F.Supp. at 101.

In the present lawsuit, an even stronger case can be made that the filing of Pitts's complaint-in-intervention played, at the very most, a negligible role in the accomplishment of his litigation objectives. The record indi-

cates that by the time Pitts intervened in this action, the Commission had already done all it could officially do to ensure the codification of the existing voting scheme. As the parties state in their stipulation regarding the role of the February 28, 1997, letter from Pitts's counsel to the Commission, once the Commission's resolution petitioning the legislature was adopted, "the legislation was enacted ... in accordance with usual practice." [8]

Thus, to return to the metaphor employed in *Craig* and *Jackson,* Pitts's efforts in this litigation, at most, put him astride a horse galloping in the same general direction as the speeding locomotive that was set in motion by the Commission when it adopted its March 12, 1997, resolution. Far from setting the train in motion or ensuring its safe passage, Pitts's participation in the lawsuit was merely a parallel effort to dismantle the Commission's then-current election system, and had no influence on the ultimate outcome of the Commission and state legislature's efforts. As explained above, Pitts has not pointed to any evidence suggesting that his activities in pursing this litigation, including the filing of his complaint-in-intervention, the filing of any pre-trial motions in the case, or any negotiations between the parties while the case was pending, played any role whatsoever in prompting or facilitating the enactment of the legislation.

The court does recognize, of course, that Pitts's *pre-litigation* efforts, specifically the letter from his counsel threatening litigation unless the Commission challenged the court's 1972 and 1986 judgments and injunctions, prompted the Commission to seek passage of the lawsuit-mooting legislation. Plainly, it was the specter of litigation that motivated the Commission to act on March 12, 1997, before the filing of Pitts's complaint-in-inter-

---

8. The process for enactment of this legislation is set forth in an affidavit by Russell County's representative to the Alabama House of Representatives, which the Commission submitted in support of a motion to stay proceedings, filed on April 8, 1997. Specifically, the affidavit states, in pertinent part, as follows: "Upon the resolution of the Russell County Commission, I requested that the attached bill be drafted which, in effect, ratifies the current seven-member district system in place in Russell County for the Russell County Commission. The bill is currently being adver-

tised in *The Phenix Citizen,* a weekly newspaper, as required by law. The advertisement will begin Thursday, March 27, 1997, and will continue through Thursday, April 17, 1997. After the required time of advertisement has run, I plan to introduce the bill into legislation." Affidavit of Leslie Vance, dated March 26, 1997. As stated, the resulting legislation, 1997 Ala. Acts 680, was signed into law on May 29, 1997, less than one and a half months after the required advertisement period ended.

vention. However, such pre-litigation activities, standing alone, are insufficient to confer prevailing party status upon Pitts. *See Forest Conserv. Council v. Devlin,* 994 F.2d 709, 712–13 (9th Cir.1993) (where party's pre-litigation activities were solely responsible for bringing about the desired result, and the lawsuit had no catalytic effect, the court held that the party could not be a prevailing party under the attorneys' fees provision of the Equal Access to Justice Act, noting that the "fact that some pre-litigation work may be compensable does not mean that pre-litigation activities are sufficient alone to make a party a prevailing party").

Thus, the court concludes that Pitts is not a prevailing party for purposes of entitlement to a fee award under 42 U.S.C.A. §§ 1973*l* (e) and 1988 because his participation in this lawsuit was not a causative agent in the accomplishment of his litigation objectives. Even if the court agrees that Pitts's goals were attained when the 1986 judgment and injunction were terminated and the lawsuit was dismissed in its entirety, which is a question that the parties hotly dispute, it cannot conclude that these results came as a consequence of Pitts's actions in this litigation, as opposed to his pre-litigation threats of suit.

The conclusion that any relief obtained by Pitts was a direct consequence of the Commission's resolution and the legislature's subsequent enactment of the legislation codifying the seven-member plan is confirmed upon examination of the specific objectives that Pitts contends he accomplished in bringing suit. Pitts maintains that he succeeded in altering the legal relationship between him and the Commission by "getting court out of business of determining the proper size for the Commission," [9] and by securing a "legis-

lative determination of size ... pursuant to resolution of a bi-racial group of county commissioners, [which] removed the racial taint arising from the judicial action" embodied in the 1972 and 1986 injunctions.[10] Assuming for the sake of argument that Pitts in fact sought these results when he intervened in this action, it is beyond dispute that to the extent Pitts's goals were actually accomplished this success stemmed directly from the state legislature's enactment of 1997 Ala. Acts 680, at the Commission's behest following adoption of the March 12, 1997, resolution, and not from anything Pitts did or said in the course of litigating this suit. The court is presently "out of the business" of determining the Commission's size not because Pitts intervened in this action, but rather because the enactment of state legislation, and its preclearance by the Department of Justice, obviated the need for the 1986 consent decree and injunction.[11]

Likewise, to the extent that any 'racial taint' can be said to have been expunged from the Commission's election system, this result stemmed not from Pitts's litigation activities, but from the Commission's pre-litigation decision to petition the state legislature to codify the existing seven-member districting plan. Once again, Pitts has not pointed to any evidence indicating that these steps, including the "legislative determination of size," were taken as a consequence of anything he did or said in the course of this litigation, as opposed to the threat of suit made in his counsel's pre-litigation letter.

The foregoing conclusion is consistent with this court's recent decision in *White v. Alabama,* No. 94–T–94–N, 1998 WL 60938 (M.D.Ala. Feb. 4, 1998), where the plaintiffs were found to be prevailing parties in their successful efforts to force the state defen-

**9.** Pl.–Interv.'s reply brief on attorneys' fees, filed on Jan. 9, 1998 (Doc. no. 86), at 2.

**10.** Pl.–Interv.'s brief in support of motion for award of reasonable attorneys' fees and costs, filed on Nov. 14, 1997 (Doc. No. 79), at 11.

**11.** In fact, as the defendants correctly pointed out to the court when it was considering how to proceed in light of the Department of Justice's preclearance of the state legislation, the 1986 consent decree, by its express terms, was due to expire as a result of this legislative action. *See* Defs.' statement, filed on Oct. 28, 1997 (Doc. no.

72). Specifically, Part V of the consent decree provides, in pertinent part, as follows: "The election process ordered hereby shall remain in force and effect until such time as an election process satisfying the requirements of the Constitution and laws of the state of Alabama has been adopted for Russell County pursuant to Alabama law." Because the enactment of 1997 Ala. Acts 680 resulted in the codification of an election process for Russell County that complied with the Constitution and Alabama state laws, there was no longer any need for the 1986 consent decree

**1448**

dants to obtain preclearance for four statutes governing the election of state judges. Although two of the statutes at issue in *White* had already been submitted to the Justice Department for preclearance by the time the plaintiffs initiated their lawsuit, this court nevertheless held that the plaintiffs were prevailing parties as to those statutes on the ground that the defendants had taken the position in litigation that preclearance was unnecessary because the statutes had been precleared by implication earlier. *Id.* at 13. Thus, this court found that the plaintiffs' lawsuit was a catalyst in that it kept pressure on the state defendants to follow through on their efforts to obtain preclearance.

Here, by contrast, there is no evidence that Pitts's lawsuit kept the Commission's feet to the fire in seeking codification of the seven-member election system. By the time Pitts sought post-judgment intervention in this lawsuit, the Commission had already taken whatever official steps it could to ensure enactment of the necessary legislation. Moreover, at no time during this litigation did the Commission indicate that it would do anything to derail the legislative process it had set in motion, or that it would take a position contrary to Pitts regarding the propriety of terminating the 1986 judgment and injunction. Thus, unlike the plaintiffs' lawsuit in *White*, Pitts's intervention in the present case did not function as a catalyst by discouraging the Commission from altering the course of its pre-litigation activities; the Commission, as stated, set the process in motion before Pitts's filed his complaint-in-intervention, and never wavered or gave any indication that it would disturb the process once it was underway.

Pitts further attempts to avoid the court's conclusion by arguing that he should be compensated for his efforts to convince the court to terminate its prior judgment and injunction in the wake of the passage of the state legislation. These activities, which of course took place during the pendency of the litigation, include his giving notice to the court of the passage of 1997 Ala. Acts 680 and his filing of a motion for leave to file a supplemental complaint-in-intervention, which cited the enactment of the legislation as an additional ground for vacating the 1986 judgment and injunction. However, these actions can

hardly be considered to have played the requisite "substantial role" in accomplishing Pitts's litigation objectives. *See W.T. v. Andalusia City Schools, supra.* For one thing, the defendants themselves notified the court of the enactment of 1997 Ala. Acts 680 on the same day that Pitts alerted the court, rendering Pitts's filings superfluous. But more importantly, as the court noted above, none of Pitts's arguments or efforts in this regard can be said to have 'caused,' in any way, the termination the 1986 judgment and injunction, because the consent decree was due to terminate on its own terms once the state legislature passed 1997 Ala.Acts 680. Thus, to the extent that Pitts's objectives were accomplished by termination of the judgment and injunction, this result was actually caused by the enactment of the state legislation, as prompted by the Commission when it adopted its pre-litigation resolution. By no means were Pitts's efforts to inform the court of the passage of the legislation or convince it to vacate the prior judgment and injunction a substantial factor in causing their termination.

### III. CONCLUSION

For the foregoing reasons, it is ORDERED that the motion for award of reasonable attorneys' fees and costs, filed by plaintiff-intervenor Andrew Pitts on November 14, 1997, is denied.