**AMERICAN COUNCIL OF THE BLIND, et al., Plaintiffs,**

v.

**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, et al., Defendants.**

**No. CIV.A.96–2058 (RMU).**

United States District Court, District of Columbia.

Feb. 13, 2001.

Bruce L. Montgomery, Kathleen A. Behan, Amy E. Ralph, Arnold & Porter, Washington, DC, for plaintiffs.

Bruce P. Heppen, Assoc. General Counsel, Washington, DC, Jane M. Lyons, Assist. U.S. Atty., Washington, DC, for defendants.

### MEMORANDUM OPINION

URBINA, District Judge.

### DENYING THE PLAINTIFFS' MOTION FOR ATTORNEYS' FEES; DISMISSING THE CASE AS MOOT

## I. INTRODUCTION

This matter comes before the court on the plaintiffs' motion to recover attorneys' fees. The plaintiffs, the American Council of the Blind, *et al.* ("the plaintiffs" or "ACB") seek attorneys' fees and costs from the Federal Transit Administration ("the FTA"), the Department of Transportation ("DOT") (collectively the "Federal Defendants"), and the Washington Metropolitan Area Transit Authority ("WMATA"). The plaintiffs contend that because they prevailed in the underlying litigation, they are entitled to reimbursement of their legal fees and costs from the Federal Defendants under the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412, and from WMATA under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12205. Specifically, the plaintiffs claim that their lawsuit led to the defendants' rejection of the Infrared Integration Indicating System ("IRIIS") and the installation of truncated domes in all key and new metro stations in Washington, D.C. Consequently, the plaintiffs allege, they are a "prevailing party" under the EAJA and the ADA for the purposes of recovering attorneys' fees.

For the reasons that follow, the court holds that the plaintiffs are not a "prevailing party." Accordingly, the court will deny the plaintiffs' motion to recover attorneys' fees.

## II. BACKGROUND

The American Council of the Blind is a not-for-profit organization that represents the interests of individuals with visual impairments. In addition to ACB, which is the lead plaintiff in this action, the named plaintiffs include several other advocacy groups for the visually impaired and a number of visually impaired individuals. *See* Compl. at 1, 8. In 1990, Congress enacted the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* The ADA authorizes the Secretary of Transportation to issue regulations to implement the anti-discrimination provisions of Title II of the ADA. *See* 42 U.S.C.

§ 12149. These regulations must conform to the guidelines issued by the Architectural and Transportation Barriers Compliance Board ("Access Board"), a body that establishes minimum requirements for compliance with the ADA. *See* 42 U.S.C. § 12149(b).

In 1991, the Access Board issued the Americans with Disabilities Act Accessibility Guidelines ("ADAAG"), which set forth the accessibility standards for platform edges in train stations. The DOT adopted the ADAAG. *See* 49 C.F.R. pt. 37. The ADAAG required that "[p]latform edges bordering a drop-off and not protected by platform screens or guard rails shall have a detectable warning. Such detectable warnings shall comply with 4.29.2 and shall be 24 inches wide running the full length of the platform drop-off." 49 C.F.R. pt. 37, App. A, § 10.3.1(8). The regulations also require that the detectable warning be comprised of "truncated domes," which are small, raised rounded surfaces. The domes also must be of contrasting color and texture from the platform, and the warning must differ from the platform in both resiliency and "sound-on-cane" contact when used in interior applications. *See* 49 C.F.R. pt. 37, App. A, §§ 10.3.2(2), 10.3.1(8), 4.29.2.

Despite the explicit specifications for detectable warnings promulgated by the Access Board, a transit authority could be excused from installing the domes by applying for, and receiving, a grant of "equivalent facilitation." The FTA Administrator may grant an equivalent facilitation if the alternative design or technology that the rail operator seeks provides "substantially equivalent or greater access to and usability of the facility" as would be provided by the truncated domes. *See* 49 C.F.R. § 37.9, 49 C.F.R. pt. 37, App. A § 2.2.

The ADA required that public transportation facilities comply with the ADA's regulations no later than July 26, 1993. *See* 42 U.S.C. § 12147(b)(2)(B). On September 3, 1992, WMATA requested a finding of equivalent facilitation for its existing platform edge. Since 1976, every WMATA rail station has utilized an edge detection system consisting of a platform floor covered with red paver tiles that contrast in both color and texture with an 18-inch edge of flame-finished granite. Within the granite edge, embedded flashing lights signal the approach of a train. *See* Federal Defendants' Opposition to Plaintiffs' Motion to Recover Attorneys' Fees ("Fed. Defs.' Opp'n"). Alternatively, WMATA asked the FTA to grandfather the existing platform edge. On December 9, 1992, the FTA denied WMATA's request to be grandfathered. *See* Fed. Defs.' Opp'n at 4. In February 1993, the FTA rejected WMATA's request for equivalent facilitation on the ground that the request contained insufficient information. Moreover, the FTA rejected WMATA's request for an extension of time in which to submit additional information. *See* Fed. Defs.' Opp'n at 4.

On March 4, 1993, WMATA submitted another request for equivalent facilitation, supplemented with additional statistical information regarding the existing edge's accessibility. *See* Compl. at 21–22. Before the FTA responded to the second equivalent-facilitation request, WMATA asked the FTA to suspend the detectable-warning requirement pending further study of the existing edge. *See* Fed. Defs.' Opp'n at 4. On December 17, 1993, the FTA denied WMATA's second equivalent-facilitation request. *See* Fed. Defs.' Opp'n at 5.

On April 6, 1994, WMATA General Manager Lawrence Reuter wrote to Transportation Secretary Federico Peña proposing four options: (1) a new rule; (2) a regulatory exemption based on WMATA's safety record with existing edges and system uniformity; (3) a voluntary-compliance agreement to give WMATA additional time to conduct testing; and (4) the addition of eight inches to the existing platform to provide a 26–inch–wide warning strip. *See* Fed. Defs.' Opp'n at 5. On May 30, 1994,

Secretary Peña rejected all four of WMATA's proposals. *See id.*

In June 1994, WMATA applied for another time extension so it could conduct a study to determine whether its current platform edge detection system provided the visually impaired with orientation information equivalent to that provided by other edge detection systems. *See* Compl. at 23. On July 7, 1994, Secretary Pena granted WMATA a temporary exemption to study alternatives to truncated domes. *See* Fed. Defs.' Opp'n at 6.

On March 22, 1995, WMATA submitted a third equivalent-facilitation request, supplemented with additional research indicating the detectability of its existing platform edge. During the course of preparing the third equivalent-facilitation request, WMATA consulted with another advocacy group for persons with visual impairments, the National Federation of the Blind ("NFB"). According to the plaintiffs, the NFB has historically been more opposed to ADA accommodations than the plaintiffs. *See* Compl. at 4. Specifically, the plaintiffs feel that the NFB believes that many ADA accommodations are paternalistic. *See id.*

In addition to the existing platform edge, WMATA proposed developing an electronic edge warning system that would alert visually impaired passengers of the proximity of the platform edge. This proposed system became known as the Infrared Integration Indicating System, or IRIIS. *See* Plaintiffs' Memorandum of Points and Authorities in Support of Motion to Recover Attorneys' Fees ("Pls.' Mem.") at 7. The FTA granted this request on April 24, 1995. The FTA required not only the existing platform edge, however, but also insisted that WMATA install its proposed IRIIS system in at least 10 metro stations by April 30, 1996, and throughout the entire metro system by May 31, 1997. *See* Fed. Defs.' Opp'n at 7.

On March 19, 1996, citing supply problems, WMATA sought a six-month extension on installation of IRIIS in the first 10 rail stations. The FTA granted this request on April 29, 1996, and extended the deadline for the initial installation to October 31, 1996. The FTA, however, expressly refused to extend the May 31, 1997 deadline for systemwide installation. *See* Pls.' Mem. at 8.

Meanwhile, on September 5, 1996, the plaintiffs filed a three-count complaint. In Count I, the plaintiffs alleged that WMATA had violated Title II of the ADA, 42 U.S.C. § 12131 *et seq.*, and the Rehabilitation Act of 1973, 29 U.S.C. § 794, by, *inter alia,* failing to install truncated domes, relying on only a small subset of the visually impaired community, misrepresenting alternative accessibility measures, and pursuing an alternative accessibility measure (the IRIIS system). Count II contained an allegation that the FTA and the DOT engaged in a pattern of arbitrary and capricious conduct that violated Section 706(2)(a) of the Administrative Procedures Act ("APA"), 5 U.S.C. § 551 *et seq.* This conduct included, *inter alia,* the FTA's determination that: WMATA could be granted an equivalent facilitation at a future date based on stationwide accessibility, WMATA could be given an equivalent facilitation on the basis of an alternative electronic detection system, WMATA could be given an equivalent facilitation without establishing guidelines for deciding how the alternative system would be in compliance with the ADA, and WMATA was entitled to a six-month time extension to install the IRIIS system. The plaintiffs also alleged in Count II that the DOT had violated the APA by, *inter alia,* failing to properly supervise the FTA, allowing WMATA to receive a grant of equivalent facilitation, and improperly granting WMATA repeated time extensions to comply with ADA-mandated structural changes.

In Count III, the plaintiffs alleged that WMATA had violated government procurement statutes, the Federal Acquisition Regulations, and its own procurement reg-

ulations by issuing a sole-source contract to the NFB for consultation about how to proceed with meeting the ADA's detectability requirements. As a result, the plaintiffs claim, WMATA violated Section 706(2)(A) of the APA, 5 U.S.C. § 551 *et seq.*

On September 5, 1996, the plaintiffs also filed a motion for a preliminary injunction to prevent the defendants from going forward with the IRIIS installation. This court denied the motion for a preliminary injunction on September 23, 1996. *See* Order Denying Pls.' Mot. for Prelim. Inj. and Denying Pls.' Mot. for Order Modifying Schedule for Prelim. Inj. Discovery and Hearing at 1. That same day, the plaintiffs filed a renewed motion for a preliminary injunction. This court denied the plaintiffs' renewed motion on October 24, 1996. *See* Order Denying Pls.' Renewed Mot. for Discovery at 3.

On October 23, 1996, seven days before the FTA's deadline for the initial IRIIS installation, WMATA submitted a status report to the FTA indicating that it had installed IRIIS in four of 12 designated stations, but would not be able to meet the October 30, 1996 deadline for initial installation in the remaining stations. As a result, WMATA requested an additional six-month extension, until April 30, 1997. *See* Fed. Defs.' Opp'n. On October 30, 1996, FTA Administrator Gordon J. Linton wrote to Richard A. White, General Manager of WMATA, and stated:

> Although I recognize that WMATA has installed the system in four Yellow Line stations and has partially installed it in a fifth, I am concerned about WMATA's inability to meet deadlines that WMATA has itself proposed. Accordingly, the Federal Transit Administration (FTA) will conduct an independent review of the reasons for WMATA's failure to meet the current deadline. My intention is to ensure the timely completion of the entire project.

*See* Appendix to Plaintiffs' Memorandum ("App. to Pls.' Mem.") at 11.

On October 30, 1996, the FTA commissioned an independent review of IRIIS by D & Z Transportation Services as Project Management Oversight Contractor ("PMOC"). *See* Pls.' Mem. at 11. On November 15, 1996, the PMOC met with WMATA to discuss the status of IRIIS. During this meeting, WMATA informed the PMOC that IRIIS was not functioning properly due to a variety of technical problems, and had to be completely redesigned. *See* Pls.' Mem. at 11.

On May 30, 1997, WMATA decided that it would not be able to install IRIIS by the deadline set by FTA. As a result, WMATA abandoned the IRIIS system, and requested the FTA's concurrence in a new equivalent facilitation consisting of a 24-inch wide strip of truncated domes, set back 18 inches from the platform edge. *See* Pls.' Mem. at 12. On June 6, 1997, the FTA informed WMATA that the April 24, 1995 grant of equivalent facilitation had expired. Furthermore, the FTA told WMATA that it would have to comply with the ADA through other means or face enforcement proceedings. See Fed. Defs.' Opp'n at 10.

On November 25, 1997, WMATA requested an equivalent-facilitation grant for a two-part detectable warning system, which essentially was the existing platform edge, supplemented with truncated domes set back 18 inches from the edge. *See* Fed. Defs.' Opp'n at 12. The FTA granted WMATA's equivalent facilitation request on February 12, 1998, and WMATA fulfilled its obligations under the second determination of equivalent facilitation in September 1999. *See* Fed. Defs.' Opp'n at 10–11.

The defendants attack the plaintiffs' motion for attorneys' fees on a wide array of substantive and procedural grounds. First, WMATA argues that since the case is moot, the court lacks jurisdiction to adjudicate the attorneys' fees petition. Second, WMATA contends that the plaintiffs' fee petition should be dismissed as untimely. Third, WMATA asserts that

the "catalyst test" for determining a prevailing party is no longer good law. Fourth, WMATA argues that even if the plaintiffs are a prevailing party, they are not entitled to fees because their victory was technical. Fifth, WMATA contends that special circumstances surrounding the case would make the awarding of attorneys' fees unjust.

The Federal Defendants argue that the plaintiffs' motion should be denied as premature and facially insufficient. Furthermore, the Federal Defendants claim that they were "substantially justified" in the positions they took during the litigation, and thus cannot be liable for attorneys' fees under the EAJA. Each defendant disputes the notion that the plaintiffs' lawsuit acted as the catalyst that prompted the installation of truncated domes.

For the reasons that follow, the court will deny the plaintiffs' motion for attorneys' fees.

## III. ANALYSIS

### A. Legal Standard

The Equal Access to Justice Act ("EAJA") authorizes a private litigant to recover attorney's fees incurred in litigation against the federal government when: (1) the litigant has prevailed in the lawsuit; and (2) the government cannot prove that its position in the lawsuit was substantially justified. *See* 28 U.S.C. § 2412(d)(1). Similarly, under the ADA, the court has discretion to award attorney's fees to a "prevailing party" other than the United States. *See* 42 U.S.C. § 12205.

Generally, for purposes of fee-shifting statutes, a prevailing party is a litigant who has "succeed[ed] on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). In the D.C. Circuit, "A party need not procure a final judgment on the merits in order to be considered a prevailing party for fee shifting purposes. It is enough

that the lawsuit was a 'causal, necessary or substantial factor in obtaining the result' plaintiff sought." *Public Citizen Health Research Group v. Young,* 909 F.2d 546, 549 (D.C.Cir.1990) (quoting *Commissioners Court of Medina County, Texas v. United States,* 683 F.2d 435, 442 (D.C.Cir. 1982)). To prove prevailing party status, a party must satisfy the "catalyst test."

### B. Catalyst Test

The defendants contend that the catalyst test is no longer good law in light of the Supreme Court's decision in *Farrar v. Hobby,* 506 U.S. 103, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992). The defendants read *Farrar* to require that a plaintiff obtain an enforceable judgment, consent decree, or a settlement giving some of the relief sought in order to qualify as a prevailing party. The Fourth Circuit has explicitly adopted the defendants' view and rejected the catalyst test. *See S–1 & S–2 v. State Bd. of Ed.,* 21 F.3d 49, 51 (4th Cir.1994) (*en banc*). The D.C. Circuit and several other circuits, however, have rejected the Fourth Circuit's analysis and have retained the catalyst test. *See Maduka v. Meissner,* 114 F.3d 1240, 1241 (D.C.Cir.1997); *accord Payne v. Board of Education,* 88 F.3d 392, 397 n. 2 (6th Cir.1996); *Stivers v. Pierce,* 71 F.3d 732, 751–53 n. 10 (9th Cir.1995); *Marbley v. Bane,* 57 F.3d 224, 234 (2d Cir.1995). Thus, the catalyst test remains good law in this circuit.

■ In this case, the plaintiffs claim that before the litigation began, WMATA sought to evade compliance with the ADA, and that the Federal Defendants acceded to WMATA's wrongful conduct. According to the plaintiffs, before this suit was filed, the FTA granted several time extensions to WMATA to test and develop the IRIIS system. *See* Pls.' Mem. at 5–7. Once the threat of litigation manifested itself, however, the FTA conducted a thorough investigation into the efficacy of IRIIS, proved its shortcomings, and required

WMATA to install truncated domes.[1] *See* Pls.' Mem. at 9–14.

While the plaintiffs correctly recite the chronology of events, they have not set forth any additional factors to demonstrate that they are prevailing parties. The D.C. Circuit does not allow a court to determine that a plaintiff is a prevailing party based on simple chronology. The plaintiffs assert that "The relevant inquiry here is whether there has been a marked change in the Federal Defendants' behavior before and after the lawsuit." Pls.' Mem. at 17. This assertion, however, incorrectly states the catalyst test. To claim prevailing party status, a plaintiff cannot merely point to a defendant's changed behavior before and after a lawsuit. Rather, the plaintiff must put forth supplemental evidence that supports a finding that a defendant changed its behavior *in response* to the lawsuit. *See Public Citizen,* 909 F.2d at 551.

To prove that a lawsuit was a causal factor in the litigation, the plaintiff must show that "it is more probable than not that the government would not have performed the desired act absent the lawsuit." *Id.* at 550. In addition, the D.C. Circuit has held that to meet the catalyst test, the plaintiff must show more than mere chronology. That is, while the chronology of events surrounding the dispute may be highly probative in determining causation, it is not dispositive. *See id.* at 551 (internal citations omitted); *see also Braafladt v. Board of Governors,* 778 F.2d 1442, 1444 (9th Cir.1985) ("We apply, as do other circuits, the rule that chronological events are important, although not a definitive factor, in determining whether or not a defendant can be reasonably inferred to have guided his actions in response to a plaintiff's lawsuit."); *Citizens Coalition for Block Grant Compliance v. City of Euclid,* 717 F.2d 964, 967 (6th Cir.1983) ("While

chronological evidence is certainly a consideration in cases of this sort ... it is not conclusive.").

Courts that have found that a party satisfied the catalyst test have required both that the case chronology support the plaintiff's allegation and that the plaintiff present additional evidence supporting the plaintiff's catalyst-theory claim. By comparing the facts of this case with the facts in cases in which courts have found that a party has met the catalyst test, the court sees important distinctions. For example, in *Pearson v. Fair,* 980 F.2d 37 (1st Cir. 1992), the court held that in addition to the chronological evidence favoring the plaintiff, the fact that the district court judge incorporated language from the plaintiff's motions into a preliminary injunction governing the treatment of inmates indicated that the lawsuit itself had led the defendant to modify its policies. *See Pearson,* 980 F.2d at 44. Conversely, in this case the court denied two requests by the plaintiffs for a preliminary injunction. Similarly, in *Turner v. Wilkinson,* 92 F.Supp.2d 697 (S.D.Ohio 1999), the court held that the case chronology, coupled with the granting of a temporary restraining order before judgment on the merits gave rise to the inference that the plaintiff's lawsuit spurred the desired action. No such prejudgment relief was granted by this court at any point in the litigation.

Moreover, in *Nong v. Reno,* 28 F.Supp.2d 27 (D.D.C.1998) (Urbina, J.), this court granted a plaintiff's request for attorney's fees under the EAJA based on the fact that the Immigration and Naturalization Service ("INS") failed to provide an A-file (verification of familial relationship) for a plaintiff immigrant until after litigation had begun. In *Nong,* this court also took the extra step of personally contacting the INS. After this court's communication with the INS, the agency provided the

---

1. As a threshold issue, WMATA asserts that if this court dismisses the plaintiffs' claims as moot, it no longer has jurisdiction over the attorneys' fees petition. The rule in this circuit, however, is that while a request for

attorney's fees will not preserve a case that is moot, a case that becomes moot during the course of the litigation will not bar an application for attorney's fees. *See Monzillo v. Biller,* 735 F.2d 1456, 1463 (D.C.Cir.1984).

requested file. The court granted attorney's fees since it found that the relief granted was a direct result of judicial intervention, which the plaintiff's lawsuit had prompted. Consequently, the court held that because the plaintiff in *Nong* had demonstrated chronology and judicial intervention brought on by the litigation, the plaintiff was a prevailing party for purposes of the EAJA. Once again, no such intervention occurred in this case.

This Circuit has recognized that chronology, combined with the lack of alternative explanations for the change in the defendants' conduct, can be strong evidence of causation. *See Public Citizen,* 909 F.2d at 551. In this case, another point in the defendants' favor is that they offer a reasonable alternative explanation for their conduct. In short, WMATA and the FTA had already engaged in numerous rounds of detailed negotiations over how WMATA would come into compliance with the ADA prior to the plaintiffs' lawsuit. WMATA's choice, it seems, was between installing the IRIIS system or the "default" system, which consisted of the truncated domes described in the ADAAG. The plaintiffs' position might have shown more than mere chronology if it had convinced WMATA to install the truncated domes in the face of numerous options. In this case, though, once IRIIS proved to be unworkable, WMATA, facing enforcement proceedings, chose to follow the default position of installing truncated domes.

■ Accordingly, the court holds that the plaintiffs have failed to carry their burden of showing that their litigation was the "but for" cause of WMATA's decision to install truncated domes. *See Public Citizen,* 909 F.2d at 550. Other courts have also denied the complainant prevailing party status under the catalyst test when the defendant had already taken substantial steps towards remedial action. *See, e.g., Craig v. Gregg County,* 988 F.2d 18 (5th Cir.1993); *Sumbry v. Russell County,* 993 F.Supp. 1439 (M.D.Ala.1998);

*Jackson v. Stevenson* 666 F.Supp. 99 (S.D.Miss.1986).

In this case, WMATA and the FTA had already been discussing ways to achieve ADA-mandated compliance since late 1992, four years before the plaintiffs filed their suit. The record does not indicate that the FTA ever contemplated granting WMATA an equivalent facilitation, regulatory exemption, or any other reprieve that would excuse WMATA's compliance with the ADA based solely on the existing platform edge. Rather, the FTA consistently required that WMATA install additional supplemental measures that would aid visually impaired riders if WMATA wanted to receive a grant of equivalent facilitation.

Moreover, when WMATA proposed installing the IRIIS system, the FTA set a final deadline of May 31, 1997, for system-wide installation of IRIIS. When it became clear that IRIIS would not be functional by the final deadline, FTA informed WMATA that regulatory enforcement efforts would be undertaken absent timely efforts to comply with the ADA through alternate means. Faced with imminent enforcement action after the failure of IRIIS, WMATA had no other alternative than to install truncated domes.

In sum, this case resembles *Sumbry,* where the court found that the plaintiff's lawsuit was "merely a parallel effort" to a plan that had already been set in motion to remedy a civil-rights violation. *See Sumbry,* 993 F.Supp. at 1446. Likewise, in this case, the court finds that the FTA's actions and the failure of alternative methods brought about WMATA's decision to install truncated domes, not the plaintiffs' suit.

■ One other point bears mention. In their motion, the plaintiffs cite *Chen v. Slattery,* 842 F.Supp. 597, 598–99 (D.D.C. 1994) for the proposition that if the defendants do not present any evidence to support alternative explanations for a government action and chronology favors the plaintiff, then prevailing party status

should attach.[2] The plaintiffs, however, misstate the law. A plaintiff bears the burden of proof to put forth evidence that supports its position in addition to demonstrating a persuasive chronological progression of events.

In the case at bar, the plaintiffs have not presented any supplemental evidence. The fact that WMATA made its ultimate decision to install truncated domes after the plaintiffs filed their lawsuit does not qualify as additional evidence. Without more, the plaintiffs have failed to carry their burden of demonstrating that their lawsuit caused WMATA to change its course of conduct, i.e., to install truncated domes. In sum, the plaintiffs fail the catalyst test.

### C. Mootness

In the intervening period between the filing of the complaint and this opinion, several events have occurred that have caused the plaintiffs' original causes of action to become moot. First and foremost, WMATA has abandoned the IRIIS system and has installed the truncated dome warnings envisioned by the ADAAG, except for the fact that the domes are not flush with the platform edge, but are set back 18 inches. The FTA found that the set-back domes provided visually impaired people with substantially the same usability as truncated domes that are flush with the edge, and granted WMATA an equivalent facilitation. As the D.C. Circuit has stated, "[E]ven where litigation poses a live controversy when filed, the [mootness] doctrine requires a federal court to refrain from deciding it if 'events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future.'" *Clarke v. United States*, 915 F.2d 699, 701 (D.C.Cir.1990) (*en banc* ) (quoting *Transwestern Pipeline Co. v. FERC*, 897 F.2d 570, 575 (D.C.Cir. 1990)).

In Count I, the plaintiffs seek six declaratory judgments that WMATA violated the ADA and the APA by seeking equivalent facilitation of the IRIIS system, by not installing truncated domes, and by delaying compliance with the ADA. WMATA finished installing truncated domes in all key and new rail stations on September 30, 1999. The D.C. Circuit has held that, "The potential of declaratory relief alone cannot save an action from mootness if the object of the suit is not 'some ongoing underlying policy, but ... an isolated agency action.'" *Columbian Rope Co. v. West*, 142 F.3d 1313, 1317 n. 3 (D.C.Cir. 1998) (quoting *City of Houston v. Department of Housing & Urban Dev.*, 24 F.3d 1421, 1429 (D.C.Cir.1994)).

In this case, WMATA has abandoned the IRIIS system, installed truncated domes, and received an equivalent facilitation that brings it into compliance with the ADA. The plaintiffs' objective in filing this suit was to prevent WMATA from installing IRIIS, and to prevent the FTA from allowing the IRIIS to replace the ADA's truncated-dome requirement. Now that WMATA has taken these steps, the plaintiffs' requests for declaratory relief in Count I are moot.

In Count I, the plaintiffs asked the court to enjoin WMATA from delaying installation of truncated domes. Truncated domes are now present in all required

---

**2.** In the *Chen* case, the INS stated that it acted on the plaintiff's request for an employment authorization document because it received additional required information, not because of the plaintiff's suit. The court stated that "[D]efendants' claim is hard to accept at face value." *Chen*, 842 F.Supp. at 599. Thus, while never directly stated, the court likely relied on the fact that not only did the chronological evidence favor the plaintiff, but the defendant had engaged in an actual mis-

representation. In essence, this would have satisfied the *Public Citizen* test of chronology plus another factor. Even assuming *arguendo* that the defendants had correctly interpreted *Chen*, one district court decision is not binding on another district court. *See, e.g., Allgood v. R.J. Reynolds Tobacco* Co., 80 F.3d 168, 172 (5th Cir.1996); *Fox v. Acadia State Bank*, 937 F.2d 1566, 1570 (11th Cir.1991); *Ramos v. Boehringer Manheim Corp.*, 896 F.Supp. 1213, 1215 (S.D.Fla.1994).

WMATA stations. Thus, the plaintiffs' request to enjoin WMATA from delaying installation is also moot. The final relief requested in Count I was an order requiring WMATA to prepare and deliver a compliance plan to the court within 30 days. Obviously, the time envisioned in the request has lapsed, and a plan is no longer needed for compliance with the ADA. Therefore, the plaintiffs' request for the court to order WMATA to deliver a plan for compliance with the ADA is now moot.

In Count II, the plaintiffs seek a declaration that the Federal Defendants acted arbitrarily, capriciously, and unlawfully during their compliance negotiations with WMATA. The plaintiffs also requested that this court enjoin the FTA from taking further arbitrary and capricious action, prevent an FTA grant of equivalent facilitation to WMATA for any detectable warning technology now in existence, and prevent the FTA from granting further time extensions to WMATA for complying with the truncated-dome requirement. The plaintiffs made each of these requests to pressure FTA into ordering WMATA to install truncated domes. Since WMATA had already installed the domes, each of these points is now moot.

In Count III, the plaintiffs asked the court to declare the IRIIS installation contract to NFB to be null and void and to enjoin the installation of IRIIS. Once again, WMATA's decision to forgo use of IRIIS and install truncated domes moots these two requests. Accordingly, the court dismisses the case as moot.

## IV. CONCLUSION

For all of these reasons, the court denies the plaintiffs' motion for attorneys' fees and dismisses the case as moot. An order directing the parties in a fashion consistent with this Memorandum Opinion is separately and contemporaneously issued this 13 day of February, 2001.