**Charla DOUCET, on behalf of Kaylee DOUCET, Plaintiff,**

v.

**CHILTON COUNTY BOARD OF EDUCATION, Defendant.**

No. Civ.A. 99–T–215–N.

United States District Court,
M.D. Alabama,
Northern Division.

Sept. 15, 1999.

1252

Deborah A. Mattison, Jill O. Radwin, Gordon, Silberman, Wiggins & Childs, Birmingham, AL, for Plaintiff.

John Hollis Jackson, Jr., Clanton, AL, Charles L. Weatherly, Julie J. Weatherly, The Weatherly Law Firm, Atlanta, GA, for Defendant.

### OPINION

MYRON H. THOMPSON, District Judge.

Plaintiff Charla Doucet, filing on behalf of her minor daughter Kaylee, sues to recover $ 40,216.21 in attorneys' fees and costs which she claims she incurred in her legal action brought under the Individuals with Disabilities Education Act, also known as the IDEA, 20 U.S.C.A. §§ 1400–1491, against defendant Chilton County Board of Education. This lawsuit is now before the court for resolution on the parties' briefs and a jointly prepared record. For the reasons that follow, the court finds for Doucet and orders the school board to pay attorneys' fees in the amount of $ 33,762.21.

## I. BACKGROUND

### A. The IDEA

Under the IDEA, the federal government provides financial assistance to States, including the State of Alabama, that provide a "free appropriate public education" to their disabled students. 20 U.S.C.A. § 1401(a)(18). The Act states that its primary purpose is "to assure that all children with disabilities have available to them ... a free-appropriate public education which emphasizes special education and related services designed to meet their unique needs, ... [and] to assure that the rights of children with disabilities and their parents or guardians are protected." § 1400(c). The Act provides for parent and guardian participation in all matters related to the child's education, and specifies procedural safeguards to ensure that parents and guardians have processes of review to address any decisions or placements which they deem inappropriate or unsatisfactory. *See* § 1415. The IDEA assures parents and guardians of the right to examine all records pertaining to evaluation and educational placement of the child, to obtain an independent evaluation of the child, and to receive prior written notice whenever the responsible educational agency proposes or refuses to change the child's placement. *See* § 1415(b).

But the driving force behind the IDEA is the "individualized education program," commonly known as the IEP. *See* § 1401(a)(20). The IEP must provide in detail for a disabled child's educational goals and objectives, including measurement techniques, and the related support services to be provided, along with the

duration of each service. *See id.* The IEP is developed at a meeting, which must include at least a parent or guardian, the child's teacher (who may be a current or a future teacher), and a representative of the local school board. *See id.* The IDEA requires that the local school board "establish or revise, whichever is appropriate, an [IEP] for each child with a disability ... at the beginning of each school year and ... then review and, if appropriate, revise, its provisions periodically, but not less than annually." § 1414(a)(5).

The IDEA further provides that if the parent or guardian is dissatisfied with the results before the local school board, she must be provided an opportunity to present a "complaint" and receive an "impartial due process hearing" with respect to the complaint. § 1415(b). If the parent or guardian is still dissatisfied, she may invoke additional administrative review by a state educational agency. *See* § 1415(c). Dissatisfaction with the agency's decision may then be subject to judicial review in a federal district court. *See* § 1415(e)(2).

### B. Factual Background

At the time Doucet initiated this action, her daughter Kaylee was a four-year-old child who suffered from periodic epileptic grand mal seizures and had been diagnosed by her treating physician as developmentally delayed and therefore in need of special educational services. Though Kaylee was at that time enrolled in a private preschool program close to her mother's workplace in Montgomery, in October 1997 Doucet filed a special education referral form for Kaylee with the school district where they resided, the Chilton County School System. The Chilton County Board of Education evaluated Kaylee and offered to provide speech and language services in Chilton County which, after somewhat lengthy disputes over the time and location of such services, Doucet ultimately accepted.

Dissatisfied with the comprehensiveness of the evaluation and services provided by the school board, in April 1998 Doucet requested that the Chilton County School Board pay for an independent evaluation for Kaylee, including evaluations for occupational and physical therapy. The board of education initially refused to honor this request. Doucet then retained attorney Jill O. Radwin to provide legal representation in her efforts to obtain more comprehensive special education services for Kaylee. On May 12, 1998, the school board agreed to pay for Kaylee's independent evaluation.

Despite having attended a total of three IEP team meetings in Chilton County, the parties were still unable to reach an agreement as to the full range of academic and related services required by Kaylee, so on August 24, 1998, Doucet submitted a request for an informal due process hearing. One month later, on September 24, the parties reached a preliminary agreement for an IEP for Kaylee that provided a full-time academic preschool program at Clanton Elementary School, including a classroom aide, speech and language services, occupational therapy, and a behavior plan. Pursuant to the completion of this IEP, the parties entered into a formal settlement agreement on February 4, 1999.

On March 3, 1999, Doucet initiated this lawsuit to recover reasonable attorneys' fees and expenses under § 1415(e)(4) of the IDEA. This lawsuit is currently before this court under an agreement by both parties for judgment based on the record.

### II. AVAILABILITY OF ATTORNEYS' FEES

■ The attorneys' fee provision of the IDEA gives this court discretion to "award reasonable attorneys' fees as part of the costs to the parents or guardian of a child or youth with a disability who is the prevailing party." 20 U.S.C.A. § 1415(e)(4). In order to succeed on such a claim, Doucet must satisfy two elements: that there was a dispute between her and the school authority, and that she was the prevailing party in the dispute. *See W.L.G. v. Houston County Bd. of Educ.,* 975 F.Supp. 1317, 1324 (M.D.Ala.1997) (Thompson, J.).

The Chilton County School Board contends that Doucet has failed to meet her burden as to both elements.

### A. "Dispute" under the IDEA

■ Some courts have found that the lack of a dispute prevented the awarding of attorneys' fees. They rely on language from *Texas State Teachers Ass'n v. Garland*, 489 U.S. 782, 792, 109 S.Ct. 1486, 1493, 103 L.Ed.2d 866 (1989), which requires "at a minimum to be considered a prevailing party ... the plaintiff must be able to point to a resolution of the *dispute* which *changes the legal relationship* between itself and the defendant." (emphasis added).

In *Payne v. Bd. of Educ.*, 88 F.3d 392 (6th Cir.1996), a parent challenged a long-term IEP which would have eventually placed her child in home schooling. After the request for a due-process hearing, the school modified the IEP, and the hearing request was dismissed. The court noted that the school "never took a position contrary to that of Payne" and "acknowledged its responsibility for Payne's education," and that the school had begun a multi-disciplinary team-meeting process before the due-process-hearing request. *Id.* at 398. In sum, this led the trial court to find, and the Sixth Circuit Court of Appeals to affirm, that there was no "dispute" between the parties that would warrant the granting of attorneys' fees to the parent. *Id.*

The Ninth Circuit Court of Appeals used similar reasoning in denying a request for attorneys' fees, holding that "[t]wo IEP meetings, which resulted in a school placement that satisfied the parents, did not give rise to a dispute for the purposes of section 1415(e)(4)(B) of the IDEA." *Kletzelman v. Capistrano Unified School Dist.*, 91 F.3d 68 (9th Cir.1996), *cert. denied*, 517 U.S. 1191, 116 S.Ct. 1681, 134 L.Ed.2d 783 (1996).

The Chilton County Board of Education claims that there was no matter actually in dispute during the time in question. It offers as supporting evidence the fact that it did respond to Doucet's special education referral by evaluating Kaylee and offering her speech and language services. In addition, the school board notes that the results of the independent evaluation were not available for consideration by the time Doucet filed her due-process-hearing request, so it could not possibly have responded to such evaluation before Doucet initiated this legal action.

The Board of Education's argument fails, however, when the totality of the circumstances is taken into account. Doucet disputed two aspects of the school board's response to her referral for special education services. First, she expressed to the board of education in writing by letter dated April 9, 1998, her concern that the evaluation conducted by the school district was inaccurate and incomplete, and she therefore sought an independent evaluation at the public expense. The Chilton County Board of Education denied this request outright, and it was not until the school board received correspondence from Doucet's attorney one month later that it agreed to pay for the outside evaluation.

Secondly, Doucet disputed the services that the school board had offered to provide Kaylee. Though she accepted the speech and language services that it offered, she believed that Kaylee also required occupational and/or physical therapy. School officials did not agree to provide these services at any of the three IEP meetings that Doucet attended prior to her filing a request for a due process hearing, but rather maintained that the only service available to Kaylee was speech and language therapy.

■ The IDEA provides for the award of attorneys' fees only "if an action or proceeding," and not just a preliminary or preparatory measure, is brought under the Act. A request for a due process hearing creates a "dispute" for these purposes only if such request is warranted by the defendant school board's action or inaction in response to plaintiff's demands. *See W.L.G.*, 975 F.Supp. at 1325. "It is implic-

it from this procedural structure that, before a school system can be saddled with attorneys' fees, the school system must have done something to warrant the 'action or proceeding,' and, of course, the school system cannot have done something to warrant the 'action or proceeding' unless and until the complainant has presented to it a claim which it has rejected or otherwise inadequately addressed. To read the Act otherwise would be to pervert it, for such a reading would allow a complainant to pervert 'all' conduct by a school board into an 'action or proceeding,' bringing with it an entitlement to attorneys' fees, simply by requesting a due-process hearing, regardless as to whether the circumstances had reached the appropriate evolutionary point that would warrant or justify a due-process hearing." *Id.*

In this case, Doucet waited ten months after her initial referral for special education services for Kaylee before she initiated a due process hearing; during this time school officials performed what Doucet considered to be an inadequate evaluation of Kaylee, and offered a service plan that Doucet considered insufficient. Doucet was justifiably frustrated at this point and appropriately requested a due process hearing. This case is therefore distinguishable from *W.L.G.*, in which this court found that there was no dispute between plaintiff and defendant school district because the school board was "fully cooperative," *id.* at 1324, with plaintiff's demands, and plaintiff "never gave [the school board] an opportunity to reject or otherwise fail to address adequately their concerns before requesting a due-process hearing." *Id.* at 1325.

### B. "Prevailing Party"

■ In addition to demonstrating that there was a dispute at the time she initiated legal action, Doucet must show that she was a "prevailing party" in the action. This requirement includes two elements: Doucet must demonstrate that she obtained some of the relief originally sought, and that there was a causal connection between her legal action and the school

board's grant of relief. *See W.T. v. Andalusia City Schools*, 977 F.Supp. 1437, 1441–1445 (M.D.Ala.1997) (Thompson, J.).

■ To show that she substantially prevailed, a party must "receive at least some relief on the merits of [her] claim." *Texas State Teachers Ass'n*, 489 U.S. at 792, 109 S.Ct. at 1493 (quoting *Hewitt v. Helms*, 482 U.S. 755, 107 S.Ct. 2672, 96 L.Ed.2d 654 (1987)) (describing the standard for determining "prevailing party" under Civil Rights Attorney's Fee Statute, 42 U.S.C.A. § 1988). In this case, Doucet has clearly met this standard. Not only did she receive public funding for the independent evaluation that she had requested, but the IEP that was ultimately developed for Kaylee provided for services over and above those initially requested by Doucet. In addition to receiving occupational therapy services, Kaylee was placed in an academic preschool program at Clanton Elementary School, which includes the use of a classroom aide and a behavior management plan.

■ The Eleventh Circuit Court of Appeals has long recognized a second element in determining whether a plaintiff was a prevailing party, namely whether the plaintiff's legal action was a 'catalyst' for the delivery of the relief that was granted. *See, e.g., Royal Crown Cola Co. v. Coca–Cola Co.*, 887 F.2d 1480, 1486 (11th Cir.1989) ("Nonetheless, even in the absence of judicial relief, a plaintiff may still be a prevailing party if the plaintiff can show that his or her lawsuit was a causal link prompting some remedial action.... Such a causal connection or link is established by evidence that the lawsuit was a substantial factor or a significant catalyst in motivating the defendants to end their unlawful behavior."), *cert. denied*, 497 U.S. 1011, 110 S.Ct. 3258, 111 L.Ed.2d 767 (1990); *Fields v. City of Tarpon Springs*, 721 F.2d 318, 321 (11th Cir. 1983) ("To determine if a party has prevailed when there is no judicial relief this circuit has used the catalyst test. The catalyst test of prevailing party requires

showing that the lawsuit is a causal link that prompted some remedial action."); *see also Gingras v. Lloyd,* 740 F.2d 210, 213 (2d Cir.1984) (Congress did not "intend[ ] that fees be awarded to a plaintiff ... who obtained only benefits that the defendant plainly would have conferred even in the absence of a lawsuit."); *American Constitutional Party v. Munro,* 650 F.2d 184, 188 (9th Cir.1981) ("[T]he courts have required consistently that plaintiffs seeking to qualify as 'prevailing parties' establish some sort of clear, *causal relationship* between the litigation brought and the practical outcome realized.") (emphasis in original).

There is some question as to whether the catalyst theory is still viable after the Supreme Court's decision in *Farrar v. Hobby,* 506 U.S. 103, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992). In *Farrar,* the Court addressed the proper standard to apply to a civil rights attorneys' fee claim under 42 U.S.C.A. § 1988 in a case where the plaintiffs sought monetary damages and were awarded only nominal damages. 506 U.S. at 106, 113 S.Ct. at 570. The Court stated that "to qualify as a prevailing party, a civil rights plaintiff must obtain at least some relief on the merits of his claim. The plaintiff must obtain an *enforceable judgment* against the defendant from whom fees are sought, or comparable relief through a consent decree or settlement." *Id.* at 111, 113 S.Ct. at 573 (emphasis added) (citations omitted).

An analysis of the case law shows that most Courts of Appeals still support the catalyst theory in civil rights litigation. *See, e.g., Goehring v. Brophy,* 94 F.3d 1294 (9th Cir.1996); *Payne v. Bd. of Educ.,* 88 F.3d 392 (6th Cir.1996); *Marbley v. Bane,* 57 F.3d 224 (2d Cir.1995); *Zinn v. Shalala,* 35 F.3d 273 (7th Cir.1994); *Baumgartner v. Harrisburg Housing Authority,* 21 F.3d 541 (3rd Cir.1994); *Little Rock School Dist. v. Pulaski County Special School Dist., No. 1,* 17 F.3d 260 (8th Cir. 1994); *Craig v. Gregg County,* 988 F.2d 18 (5th Cir.1993); *Paris v. U.S. Dept. of Housing and Urban Development,* 988 F.2d 236 (1st Cir.1993); *American Council of the Blind of Colorado, Inc. v. Romer,* 992 F.2d 249 (10th Cir.1993), *cert. denied,* 510 U.S. 864, 114 S.Ct. 184, 126 L.Ed.2d 143 (1993); *cf. S–1 and S–2 v. State Bd. of Educ.,* 21 F.3d 49 (4th Cir.1994) (en banc) (deeply divided (seven to six) court held that, after *Farrar,* a person may not be a prevailing party under a catalyst theory for changes in the opposing party's conduct instigated *after* judgment or dismissal), *cert. denied,* 513 U.S. 876, 115 S.Ct. 205, 130 L.Ed.2d 135 (1994).

The Eleventh Circuit has not yet ruled on the fate of the catalyst theory after *Farrar.* See *Cullens v. Georgia Dept. of Transp.,* 29 F.3d 1489, 1494–95 and n. 4 (11th Cir.1994) (recognizing controversy over the continuing use of catalyst theory but explicitly declining to rule on it). At least three district courts in this circuit, including this one, have relied on the catalyst theory in awarding attorneys' fees in the years after *Farrar,* however. *See, e.g., W.T. v. Andalusia City Schools,* 977 F.Supp. 1437, 1446 (M.D.Ala.1997) (Thompson, J.); *Southeastern Fisheries Ass'n v. Chiles,* 876 F.Supp. 270, 271 (S.D.Fla.1995) (King, J.) ("the sound legal analysis of the First, Third, Fifth, Eight and Tenth Circuits, holding that the catalyst theory is the proper standard to apply in determining the issue here presented, controls"); *Grinsted v. Houston County School Dist.,* 826 F.Supp. 482, 485 (M.D.Ga.1993) (Owens, J.) (using catalyst test to grant attorneys' fees in IDEA case).

In addition, the Eleventh Circuit's catalyst test has, if anything, only been called into question, not overruled, by the Supreme Court's decision in *Farrar.* A number of cases have established that the mere weakening by the Supreme Court of a prior panel decision is insufficient to permit a later circuit panel, and by extension the trial courts within the circuit, to refrain from following the prior decision. *See Florida League of Professional Lobbyists, Inc. v. Meggs,* 87 F.3d 457, 462 (11th Cir.) (Circuit courts are "not at liberty to

disregard binding case law that is so closely on point and has only been weakened."), *cert. denied,* 519 U.S. 1010, 117 S.Ct. 516, 136 L.Ed.2d 405 (1996); *United States v. Smith,* 122 F.3d 1355, 1359 (11th Cir.1997) ("[E]ven where it has been weakened, but not overruled, by a Supreme Court decision, prior panel precedent must be followed."), *cert. denied,* 522 U.S. 1021, 118 S.Ct. 614, 139 L.Ed.2d 500 (1997). Because the language in the *Farrar* opinion only weakened, if anything, circuit precedent for the catalyst test, this court concludes that the catalyst theory survives *Farrar* in the Eleventh Circuit, and that it is the appropriate tool with which to analyze Doucet's claim for attorneys' fees and expenses.

In order to determine whether Doucet's legal challenge was a catalyst for the changes in Kaylee's educational plan, the court must conduct a detailed inquiry into the facts surrounding the origin and resolution of the dispute between the parties. Specifically, the court can look to the chronology of events, the nature of the relief sought and obtained, and the role of the plaintiff's action in activating the change. *Fields,* 721 F.2d at 321.

It is important to remember that, in law, context is usually critical, and this is especially true here. The IDEA, as stated, requires that the local school board "establish or revise, whichever is appropriate, an [IEP] for each child with a disability ... at the beginning of each school year and ... then review and, if appropriate, revise, its provisions periodically, but not less than annually." 20 U.S.C.A. § 1414(a)(5). The IDEA recognizes that, in the life of a developing child, lost months, and even lost weeks, can be crippling. Therefore, parents and guardians cannot be expected to wait months, or even weeks, for responses and relief from local school boards before taking appropriate action, including legal action. In IDEA matters, time is of the essence, and the expected time for action is usually very short. *See, e.g., Myles S. v. Montgomery County Bd. of Educ.,* 824 F.Supp. 1549,

1555. (M.D.Ala.1993) (Thompson, J.) ("Thus, the IDEA required the school system to establish Myles's actual IEP, not a preparatory IEP, before August 28, when the school year began, even if that required meeting with Myles as well as with his parents over the summer. Similarly, the school system violated the requirement that a meeting to develop an actual, rather than preparatory, IEP 'be held within thirty calendar days of a determination that the child needs special education and related services.' 34 C.F.R. § 300.343(c). Even using the July 29 date, the August 9 preparatory IEP meeting did not suffice. The actual IEP meeting did not take place until September 9, more than 30 days after July 29.").

This case presents a factual scenario similar to that addressed by the court in *W.T. v. Andalusia City Schools,* 977 F.Supp. 1437, 1446 (M.D.Ala.1997) (Thompson, J.), wherein this court found that "the relative proximity of defendant's reassessment of [plaintiff] to the filing of the federal lawsuit, following a lengthy period of inactivity or active resistance from the [defendant school system] is compelling evidence that the lawsuit had an effect on defendant's granting the requested relief." Likewise, in this case the school board maintained its position of flatly rejecting Doucet's request for public funding of Kaylee's independent evaluation for over a month. The board of education finally relented and agreed to pay for the testing just five days after Doucet's newly retained attorney wrote a letter to the Chilton County School Board's director of special services making the same demand. Similarly, the school district failed to offer or even inform Doucet of the availability of either occupational and physical therapy services, or placement in an academic preschool program until shortly after Doucet filed a request for a due process hearing. While nearly ten months elapsed between Doucet's initial submission of a referral form for special education services and her request for a due process hearing, it was only one more month before the IEP meeting occurred where the board of edu-

cation agreed to provide the full range of services requested by Doucet.

The Chilton County School Board attempts to explain the timing of these events by claiming that it understood Doucet to be demanding services for Kaylee in Montgomery, and believed that she would therefore reject any offer of services in Chilton County. Once Doucet expressed a willingness to accept services for Kaylee in Chilton County, the board claims, it did provide all the necessary services for her. Though there might have been some degree of miscommunication between the parties, this argument seems disingenuous in light of the fact that Doucet did file a referral for special education services with the Chilton County Board of Education rather than in Montgomery. In addition, on March 17, 1998, five months prior to her request for a due process hearing, Doucet wrote a letter to the special education coordinator in Chilton County stating explicitly, "I want to reiterate in writing that I did not say I wasn't interested in services provided by Chilton County." After this point the school board should have had no doubt that Doucet was actually seeking for Kaylee special education services provided by Chilton County.

▉▉▉ The law does not require Doucet to show that her litigation was the only cause of the Chilton County Board of Education's actions; the catalyst theory merely requires that they show that the litigation "played a substantial role" in the defendant's remedial action. *Royal Crown Cola Co.*, 887 F.2d at 1486. Motivation "is frequently multipurposed." *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 265 n. 11, 97 S.Ct. 555, 563 n. 11, 50 L.Ed.2d 450 (1977). The removal, therefore, of even a " 'subordinate' purpose" may change the outcome. *Id.* Chilton County's ultimate offer of occupational therapy and an academic preschool program for Kaylee might have resulted in part from the fact

that the independent evaluation results had finally become available. Doucet has nonetheless met her burden in demonstrating that her her legal action also played a substantial, catalytic role in the achieving these educational outcomes for Kaylee.

For these reasons, this court concludes that Doucet was a prevailing party in her dispute with the Chilton County Board of Education, and she is therefore entitled to reimbursement for her reasonable attorneys' fees and expenses, as provided in § 1415(e)(4).

### III. AMOUNT OF ATTORNEYS' FEES

▉▉▉ The remaining issue before the court is the amount of fees that Doucet should be awarded. The starting point in setting any attorneys' fee award is determining the 'lodestar' figure—that is, the product of the number of hours reasonably expended to prosecute the lawsuit and the reasonable hourly rate for work performed by similarly-situated attorneys in the community. *See Norman v. Housing Auth. of City of Montgomery*, 836 F.2d 1292, 1299 (11th Cir.1988). The fee applicant bears the burden of "establishing entitlement and documenting the appropriate hours and hourly rates." *Norman*, 836 F.2d at 1303. After calculating the lodestar fee, the court should then proceed with an analysis of whether any portion of this fee should be adjusted upwards or downwards. *See Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565–66, 106 S.Ct. 3088, 3098, 92 L.Ed.2d 439 (1986); *see also Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987).

▉▉▉ In making the above determinations, the court is guided by the twelve factors set out in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir.1974).[1] *See Blanchard v. Ber-*

---

1. In *Bonner v. Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding pre-

cedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

*geron,* 489 U.S. 87, 91–92, 109 S.Ct. 939, 943–44, 103 L.Ed.2d 67 (1989). These factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill required to perform the legal services properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

### A. Reasonable Hours

 Attorneys Deborah A. Mattison and Jill O. Radwin represented Doucet in this case. Mattison seeks compensation for 15.38 hours, and Radwin seeks compensation for 227.40 hours.

The court considers three *Johnson* factors—the time and labor required, the novelty and difficulty of the case, and the amount involved and the result obtained—in assessing the reasonableness of the hours claimed by counsel for the Doucet. Looking to the time and labor required, the court concludes that the time expended is reasonable within the scope of the proceedings, especially in light of the fact that the board of education's attorneys have reported spending even more time on this case than have Doucet's counsel. As for the novelty and difficulty of the case, the case presents issues of average difficulty, although the issues do require some specific knowledge of special education litigation on the part of the attorneys in order to represent Doucet effectively. In addition, the case involves special education services for a preschool-age child, which is itself a unique area within the field of special education law. Finally, as to the result reached in the case, the time expended, in combination with the attorneys' special knowledge, did result in substantial educational benefits for Kaylee.

While the total number of hours for which Doucet's attorneys seek compensation might seem high, the court notes that approximately 90, or over one third, of those hours account for time spent on this litigation. It is well-settled that compensation for time expended in the pursuit of attorneys' fees is proper. *See Johnson v. Mississippi,* 606 F.2d 635, 638 (5th Cir. 1979). It was well within the power of the school board, which now claims that the compensation requested is unreasonable, to have substantially reduced the number of hours opposing counsel spent on the case by not bringing this matter to federal court. By generating this additional litigation, the school board knowingly risked having to pay for it.

After conducting an independent review of the hours claimed to determine if there was any time that should be excluded because it was "excessive, redundant, or otherwise unnecessary," *Hensley,* 461 U.S. 424, 434, 103 S.Ct. 1933, 1939–40 (1983), the court is satisfied that the hours listed appear to have been reasonably necessary to secure relief in this case.

Based on this analysis, the court concludes that the attorneys for Doucet are entitled to the following hours:

| | |
|---|---|
| Radwin | 227.40 hours |
| Mattison | 15.38 hours |

### B. Prevailing Market Rate

 "A reasonable hourly rate is the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation." *Norman,* 836 F.2d at 1299. Radwin contends that she is entitled to $ 150 per hour, and Mattison that she is entitled to $ 250 per hour.

To determine the prevailing market rate, the court will consider the following *Johnson* factors: customary fee; whether the fee is fixed or contingent; the novelty and difficulty of the questions; the skill required to perform the legal services properly; the experience, reputation, and ability of the attorneys; time limitations;

preclusion of other employment; undesirability of the case; nature and length of professional relationship with the client; and awards in similar cases.

*Customary fee:* "The customary fee for similar work in the community should be considered." *Johnson,* 488 F.2d at 718. Doucet has submitted affidavits of three attorneys who practice in Alabama in the field of special education law, each of whom contends that the hourly rates requested by Radwin and Mattison are reasonable as compared with other attorneys practicing special education law across the state. In response, the school board points out that all three of these affiants charge a lower hourly rate than that requested by Mattison; two charge $ 175 per hour, and the other $ 150 per hour. The Chilton County School Board also presents the affidavit of an attorney who has practiced in Montgomery, Alabama in the field of special education law, who claims that the standard hourly rate in the community for someone of Mattison's experience and in this field is between $ 150 and $ 200, while the standard rate for someone of Radwin's experience is between $ 125 and $ 150.

 Because " 'reasonable fees' ... are to be calculated according to the prevailing market rates in the relevant community," *Blum v. Stenson,* 465 U.S. 886, 895, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984), the issue is the legal "market rate," not an individual lawyer's rate. *See also Norman,* 836 F.2d at 1299 ("A reasonable hourly rate is the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation"); *Public Interest Research Group of N.J., Inc. v. Windall,* 51 F.3d 1179, 1185 (3d Cir.1995) ("the attorneys' usual billing rate ... is not dispositive"). Because of the limited number of special education litigators in the Alabama legal market, the customary fee is difficult to ascertain, but the court can consider the limited evidence of rates presented by attorneys doing special education work, and the evidence of rates presented by attorneys doing other civil rights litigation. The evidence suggests that fees can range anywhere from $ 100 to $ 250 per hour, depending on the skills, experience, and reputation of the attorney, with the range focusing on rates between $ 125 and $ 200 per hour.

 *Fixed or contingent fee:* "This factor focuses judicial scrutiny solely on the existence of any contract for fees that may have been executed between the party and his attorney." *Medders v. Autauga County Bd. of Educ.,* 858 F.Supp. 1118, 1127 (M.D.Ala.1994) (Thompson, J.) (*citing Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 483 U.S. at 723, 107 S.Ct. at 3085). "The fee quoted to the client or the percentage of the recovery agreed to is helpful in demonstrating the attorneys' fee expectations when he accepted the case." *Johnson,* 488 F.2d at 718. In this case, Doucet entered into a contingency fee relationship with her attorneys. The attorneys, therefore, have not collected any fees because the case did not advance to trial and result in a judgment against the defendant. Although this is a laudable arrangement in the sense that the attorneys were willing to front time and money to the plaintiff in pursuit of her claims, the expectation of a sizable return should they succeed with the plaintiff's case could skew the amount of the time the attorneys would devote to a case because of their vested interest, and result in higher hours than would be most efficient.

*Novelty and difficulty of the questions:* This case presented issues of average difficulty that required some specific knowledge of special education litigation, as well as some specialized knowledge in the area of preschool services, to effectively represent Doucet.

 *Skill required to perform the legal services properly:* "The trial judge should closely observe the attorney's work product, [his or her] preparation, and general ability before the court. The trial judge's

expertise gained from past experience as a lawyer and his observation from the bench of lawyers at work become highly important in this consideration." *Johnson,* 488 F.2d at 718. Special education litigation cases require attorneys with specific knowledge of the area of law. The court had limited contact with the attorneys in this case, but they performed adequately, and acted in a professional manner.

■ *Experience, reputation, and ability of the attorneys:* "Most fee scales reflect an experience differential with the more experienced attorneys receiving larger compensation. An attorney specializing in civil rights cases may enjoy a higher rate for his expertise than others, providing his ability corresponds with his experience. Longevity *per se,* however, should not dictate the higher fee. If a young attorney demonstrates the skill and ability, he should not be penalized for only recently being admitted to the bar." *Johnson,* 488 F.2d at 718.

Radwin has very little experience in this field. She has only practiced law since 1993, and when she was retained by Doucet she had been practicing in the field of special education law for less than a year. Therefore, the hourly rate awarded for Radwin by this court should be at the low end of the range. *See Coleman v. Cannon Oil Co.,* 911 F.Supp. 510, 515 (M.D.Ala. 1995) (Thompson, J.) ("A lawyer already skilled in the area could demand a higher rate because he or she would be more knowledgeable and could work more efficiently"); *Dillard v. City of Elba,* 863 F.Supp. 1550, 1553 (M.D.Ala.1993) (Thompson, J.) (experienced attorneys prosecuted case in fewer hours than inexperienced attorneys would have); *Curry v. Contract Fabricators Inc. Profit Sharing Plan,* 744 F.Supp. 1061, 1071 (M.D.Ala. 1988) (Thompson, J.) (attorney's "inexperience should be reflected in [lower] ... hourly rate"), *aff'd,* 891 F.2d 842 (11th Cir.1990).

Mattison, by contrast, is an attorney of much experience, and has devoted her entire 19–year legal career to advocacy on behalf of individuals with disabilities. She has represented disabled persons in both Michigan and Alabama in individual and class-action litigation involving a variety of ground-breaking legal issues. In addition, Mattison has taught law students about special education law, published articles in the field, and has received numerous awards for her work. She has rightfully earned her reputation as one of the most experienced, knowledgeable, and able lawyers in the State of Alabama in the area of disabilities law. As a result, the court finds that the fee award for time expended by Mattison in this litigation should be closer to the high end of the range.

■ *Time limitations:* Where there has been "[p]riority work that delays the lawyer's other legal work," this factor requires "some premium." *Johnson,* 488 F.2d at 718. There is no specific evidence of such limitation here.

■ *Preclusion of other employment:* This factor "involves the dual consideration of otherwise available business which is foreclosed because of conflicts of interest which occur from the representation, and the fact that once the employment is undertaken the attorney is not free to use the time spent on the client's behalf for other purposes." *Johnson,* 488 F.2d at 718. Though no specific evidence was presented to support this factor, plaintiff's attorneys make general contentions that they will have conflicts, and that time was taken away from other cases they could have been litigating. This is certainly true to some degree, although there is no indication of a particularly compelling case here.

■ *Undesirability of the case:* "Civil rights attorneys face hardships in their communities because of their desire to help the civil rights litigant.... Oftentimes [his or her] decision to help eradicate discrimination is not pleasantly received by the community or [his or her] contemporaries." *Johnson,* 488 F.2d at 718. Moreover, civil rights litigation is

seen "as very undesirable because it stigmatizes an attorney as a 'civil rights lawyer' and thus tends to deter fee-paying clients, particularly high-paying commercial clients, from seeking assistance from that lawyer." *Stokes v. City of Montgomery,* 706 F.Supp. 811, 815 (M.D.Ala.1988) (Thompson, J.), *aff'd,* 891 F.2d 905 (11th Cir.1989) (table).[2] The results of such litigation tend to arouse the emotions of all concerned, and frequently the attorneys who bring these cases are the subjects of prolonged and vitriolic hostility. This factor "can have an economic impact on [an attorney's] practice which can be considered by the Court." *Johnson,* 488 F.2d at 718.

This was a somewhat undesirable case. In general, civil rights litigation is seen as undesirable for the reasons described above. In addition, the case does alienate the attorneys from other clients they could take, and does not produce a relationship with a client that is on-going. It also tends to direct an attorney to other cases of a similar sort.

*Nature and length of relationship with client:* Doucet did not have any prior professional relationship with Radwin and Mattison, and a continuation of the relationship into the future is not expected.

■ *Awards in similar cases:* "The reasonableness of a fee may also be considered in the light of awards made in similar litigation within and without the court's circuit." *Johnson,* 488 F.2d at 719. The court has awarded non-contingent fees in the range of $ 125 to $ 290 an hour in civil rights cases. *See, e.g., Black v. M.G.A., Inc.,* 51 F.Supp.2d 1315 (M.D.Ala.1999); *Gay Lesbian Bisexual Alliance v. Sessions,* 930 F.Supp. 1492, 1496 (M.D.Ala. 1996) (Thompson, J.); *Reynolds v. Alabama Dep't of Transp.,* 926 F.Supp. 1448, 1457 (M.D.Ala.1995) (Thompson, J.); *Coleman,* 911 F.Supp. at 516; *Lee v. Randolph County Bd. of Educ.,* 885 F.Supp. 1526, 1531–32 (M.D.Ala.1995) (Thompson, J.);

*James v. City of Montgomery,* Civil Action No. 94–T–264–N, 1995 WL 271138 (M.D.Ala. April 19, 1995) (Thompson, J.); *Stokes v. City of Montgomery,* 157 F.R.D. 514, 519 (M.D.Ala.1994) (Thompson, J.); *City of Elba,* 863 F.Supp. at 1554; *Medders,* 858 F.Supp. at 1129; *Wyatt By and Through Rawlins v. King,* Civil Action No. 3195–N, 1991 WL 640065, at *3 (M.D.Ala. Dec.17, 1991) (Thompson, J.), *aff'd,* 985 F.2d 579 (11th Cir.1993) (table); *Robinson v. Alabama State Dept. of Educ.,* 727 F.Supp. 1422, 1428 (M.D.Ala.1989) (Thompson, J.), *aff'd,* 918 F.2d 183 (11th Cir.1990) (table); *Stokes,* 706 F.Supp. at 815.

The court is of the opinion, based on these criteria, that Radwin is entitled to an hourly rate of $ 125 per hour, while Mattison is entitled to $ 200 per hour. In reaching this conclusion, the court puts particular emphasis on the experience level of the attorneys, as well as the hourly rates of other Alabama attorneys with comparable experience and legal practices. The court did give some credit to the attorneys for whatever specialized knowledge they had to bring to the litigation, and the uncertainty and negative aspects of litigating this type of case.

### C. Lodestar Calculation

■ The unadjusted lodestar for an attorney consists, as stated, of the product of the attorney's compensable hours multiplied by the prevailing market fee. The lodestars for Doucet's attorneys are therefore as follows:

| | | |
|---|---|---|
| Radwin | 227.40 hours × $ 125 | $ 28,425.00 |
| Mattison | 15.38 hours × $ 200 | 3,076.00 |
| Total | | $ 31,501.00 |

An adjustment of the lodestar either upward or downwards is not warranted in this case.

The court recognizes that, in applying the Johnson factors, it is possible to be so focused on the factors that you miss the

---

**2.** *See also Medders,* 858 F.Supp. at 1128; *Robinson v. Alabama State Dept. of Educ.,* 727 F.Supp. 1422, 1428 (M.D.Ala.1989) (Thompson, J.), *aff'd,* 918 F.2d 183 (11th Cir.1990) (table).

big picture. A court's duty in determining reasonable fees is not simply to recite these factors, plug in the data, and spit out the result. The total amount awarded must still bear some overall reasonable relationship with the result obtained by the prevailing party. Here, Doucet has sought fees not only for the time expended before this suit was filed, but also for the time spent in this litigation in the pursuit of fees. Indeed, a good chunk of her time has been spent on the latter. But the school board can blame only itself for the additional time; the board has fought hard her request for fees, and she has had to respond in kind. The court therefore believes that the total amount of $ 31,501.00 is reasonable.

### D. Expenses

Doucet also requests an award in the amount of $ 1,201.71 for the expenses incurred in connection with this litigation. With the exception of routine overhead office expenses normally absorbed by the practicing attorney, all reasonable expenses incurred in case preparation, during the course of litigation or as an aspect of settlement of the case, may be taxed as costs; the standard of reasonableness is to be given a liberal interpretation. See NAACP v. City of Evergreen, 812 F.2d 1332, 1337 (11th Cir.1987); Dowdell v. City of Apopka, 698 F.2d 1181, 1192 (11th Cir. 1983).

The school board makes no objection to payment of expenses incurred by the plaintiff. These expenses include photocopies, faxes, postage, telephone charges, expert fees, and transcript expenses, and they total $ 1,201.71. The expenses appear to be reasonable, and the court therefore determines that they are recoverable.

### E. Paralegal Hours

Doucet further seeks compensation at the rate of $ 65 per hour for 16.30 hours of work performed by paralegal in this litigation. A prevailing party must be compensated for work done by law clerks or paralegals only to the extent that such work is "traditionally done by an attorney." *Allen v. United States Steel Corp.,* 665 F.2d 689, 697 (5th Cir. Unit B 1982).[3] The Chilton County School Board raises no general objection to this expense, nor to the number of hours expended by the paralegal. The court will therefore add to Doucet's award the amount of $ 1,059.50 for paralegal hours.

### IV. CONCLUSION

For the above reasons, this court concludes that Doucet is a "prevailing party" in this action, and thereby entitled to attorneys' fees and expenses under § 1401(a)(4). Doucet shall have and recover from the Chilton County Board of Education the sum of $ 31,501.00 for attorneys' fees, $ 1,201.71 for expenses, and $ 1,059.50 for paralegal hours, for a total amount of $ 33,762.21.

A separate and appropriate judgment will accordingly be entered by this court.

---

**3.** In *Stein v. Reynolds Securities, Inc.,* 667 F.2d 33, 34 (11th Cir.1982), the Eleventh Circuit Court of Appeals adopted as binding precedent all of the post-September 30, 1981, decisions of Unit B of the former Fifth Circuit.